[Cite as *ABV Corp. v. Cantor*, 2023-Ohio-3363.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ABV CORPORATION, DBA, ABV
CONTRACTORS CO.,

      Plaintiff-Appellee,

      v.

NEIL CANTOR, ET AL.,

      Defendants-Appellants.

:
:
:
:
:
:

No. 112237

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 21, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-954180

---

### *Appearances:*

Diemert & Associates Co., L.P.A., Joseph W. Diemert, Jr.,
and Richard S. LaPilusa, *for appellee*.

Meyers, Roman, Friedberg & Lewis; Ronald P. Friedberg;
and Amily A. Imbrogno, *for appellants*.

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Defendants-appellants Neil and Dolores Cantor appeal from a judgment of the trial court in favor of plaintiff-appellee ABV Corporation d.b.a. ABV

Contractors Co. ("ABV") after a jury trial. The Cantors argue that the jury's finding that they breached their contract with ABV is against the manifest weight of the evidence. They also claim they should have been awarded damages equal to the amount of the balance they owed under the final invoice as well as attorney fees based on the jury's finding that ABV violated the Ohio Consumer Sales Practices Act ("CSPA"). Having reviewed the record and applicable law, we find no merit to the appeal and affirm the trial court's judgment.

{¶ 2} In 2019, the Cuyahoga County mandated all houses utilizing septic tanks to connect to the county's sewer lines. In July 2020, ABV provided a proposal to the Cantors for the sewer conversion work, which included the scope, terms, costs, and specifications of the project and estimated the cost to be $8,500. ABV performed the work over a three-day period in May 2021. On the first day of the project, a county inspector visited the site and determined the sewer project required additional work not included in the proposal. ABV alleges that the Cantors approved the additional work, and it is undisputed the cost of the additional work was not discussed by the parties. The final cost for the sewer conversion work totaled $20,195. While satisfied with ABV's work, the Cantors would only pay $10,000, leaving a balance of $10,195.

{¶ 3} ABV filed the instant complaint to recover the balance of $10,195, raising claims of breach of contract and unjust enrichment. The Cantors filed an answer and a four-count counterclaim alleging breach of contract (Count 1), a violation of CSPA (Count 2), fraudulent misrepresentation and inducement

(Count 3), and negligent misrepresentation and inducement (Count 4). During the trial, the trial court dismissed the Cantors' counterclaim for breach of contract and the Cantors withdrew Counts 3 and 4.

{¶ 4} The matter proceeded to a jury trial. The jury found the Cantors breached the contract and awarded ABV $10,195. The jury, however, found ABV violated the CSPA, but only awarded the statutory damages of $200.

{¶ 5} On appeal, the Cantors raise the following assignments of error:

I.      The trial court erred in disallowing, as recoverable actual damages under Appellants' Ohio Consumer Sales Practices Act ("CSPA") claim against appellee, any amount(s) found to be due and owing from appellants to Appellee with respect to Appellee's invoice.

II.     The trial court erred in failing to treble, pursuant to R.C. 1345.09(B), Appellant's actual CSPA damages encompassing the amount(s) found to be due and owing from Appellants to Appellee with respect to Appellee's invoice.

III.    The jury's determination that Appellee's violation of the CSPA resulted from a "bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error" pursuant to R.C. 1345.11(A) was against the manifest weight of the evidence.

IV.     The trial court erred in failing to award Appellants their reasonable attorney[] fees pursuant to R.C. 1345.09(F)(2).

V.      The jury's determination that the appellants breached their contract with Appellee was against the manifest weight of the evidence.

{¶ 6} For ease of discussion, we address first the fifth assignment of error regarding ABV's breach-of-contract claim against ABV.

**Breach-of-Contract Claim: Manifest Weight of the Evidence**

{¶ 7} Under the fifth assignment of error, the Cantors argue there was no evidence presented to suggest the contract was modified to include the additional work for a final price of $20,195 and, therefore, the jury's finding that the Cantors breached the contract in failing to pay that amount is against the manifest weight of the evidence.

### A. Standard of Review

{¶ 8} When reviewing a claim that a jury verdict in a civil trial is against the weight of the evidence, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In determining whether the judgment is against the manifest weight of the evidence, "'"every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts."'" *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

{¶ 9} Furthermore, in a civil case, the burden of proof is by a preponderance of the evidence, rather than beyond a reasonable doubt. *Eastley* at ¶ 19. Preponderance of the evidence means "the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a contested fact is

more probable than its nonexistence." *Croone v. Arif*, 8th Dist. Cuyahoga No. 101103, 2014-Ohio-5546, ¶ 18, citing *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987).

**B. Trial Evidence**

{¶ 10} ABV's July 2020 proposal provides the scope of the sewer conversion work in the first sentence: ABV was to "install new 6" SDR-35 PVC pipe from sanitary sewer cleanout to edge of asphalt driveway." The proposal states the quote was based on "connecting [the sewer line] to edge of driveway" and that the extent of the pipe work is "[t]o be determined on site by Cuyahoga County Inspector, [who is to] verify [that] existing pipes under driveway to foundation are clean and working properly." Another sentence in the proposal states, "Note: Proposal price does not include: rock excavation, concrete and/or asphalt work, unknown underground obstacles, landscaping and/or seeding." A clause regarding modification states that "[a]ny deviations from the above specifications shall be executed only upon written instructions as and become extra charge."

{¶ 11} The proposal estimates the cost of the sewer connection to the edge of the driveway to be $8,500 and it contains a statement that the estimate "does not include material price increases or additional labor and materials which may be required should unforeseen problems arise after the work has started."

{¶ 12} ABV acknowledges there was no written estimate for the additional work of connecting the sewer to the foundation of the house as determined by the county inspector, who visited the site on the first day of the project, but alleges that

the Cantors were aware of the necessity of the additional work and authorized it. Cesare Frabotta and Bruno Frabotta testified on ABV's behalf.

### a. Cesare Frabotta

{¶ 13} Cesare Frabotta testified that the company was founded by his brothers in 1974. The company's work includes sewer connections, concrete work, excavating, and septic systems. He testified he has been in this line of work for 32 years and the company has an "A plus" Better Business Bureau rating and "100 percent Recommended" from "HomeAdvisor."

{¶ 14} Cesare described the work involved in converting a septic tank to a sewer line as follows: after the county installs a new sewer line for a residence to connect to, his company would excavate and find the connection to the new sewer, extend a new sewer pipe from that location to the line coming out of the residence, either outside the foundation or by the driveway, and then "abandon" the septic tank by removing any connections, demolish the components, and fill the space in with on-site materials.

{¶ 15} Cesare testified that during a sewer project, underneath gas, electric, and water lines between the residence and the road could be discovered and therefore he would always insert a clause in the work proposal that the company would not be responsible for underground lines or obstacles. He testified this is a standard practice for the industry.

{¶ 16} The final invoice of $20,195 itemizes the work and charges as follows: "pump out existing septic, multiflow & lift tank" ($680); "additional sewer from

drive edge to foundation (remove asphalt, all excavation, premium fill in drive area & cross storm sewer" ($7,480); "cleanout near foundation" ($650); fill tanks with premium stone rather than demo and damage extremely large tree" ($2,650); "replant large very old ornamental tree" ($485).

{¶ 17} The most substantial charge in the final invoice involves connecting the sewer pipe to the foundation of the house rather than to the edge of the driveway as originally proposed. Cesare testified as follows:

> I proposed to install the proper piping and bedding as per county specs from the connection out at the road to the edge of his horseshoe driveway, on the city side of the edge, because we had done other projects in other cities in the years past where the section underneath a driveway or a patio or an addition was considered a financial hardship for the homeowners. So in individual cases, they would allow those pipes to stay in place to keep the cost to the homeowners less. So that's what I quoted, going up to the edge of the driveway, but I put a specific note in my proposal saying that when we started the work, it would be reevaluated by the county and whether or not additional work needed to be done. I didn't put a number on it, because at that time I didn't know what it was going to be or how much it would cost.

{¶ 18} Cesare testified that was why the proposal contained the provision that the quote was based on a connection to the edge of driveway only, which was to be approved by the county inspector. He testified that he and the Cantors spoke many times before and after the proposal was made. The possibility that the county may require additional work came up several times in their conversations; the Cantors never asked about the price for the additional work, and he never specified it.

{¶ 19} On day one of the project, the county inspector came to the site to inspect the condition of the clay pipe underneath the Cantors' yard and informed ABV that the clay pipe must be replaced and the new sewer pipe was to be connected all the way to the foundation of the house rather than the edge of the driveway. The requirement doubled the length of the job. Cesare also explained that the Cantors' driveway is a horseshoe-shaped driveway, which created additional work because it involved extra excavated materials to be hauled off the property. Cesare testified the work was labor-intensive and involved a large area underneath the yard, causing a significant increase in the price.

{¶ 20} Cesare immediately informed Neil of the city's requirement of the additional connection. Neil's reaction was "do whatever you've got to do to get the job done." Cesare took it as an authorization to proceed with the additional work.

{¶ 21} Cesare testified that the sewer conversion for the Cantors' residence was the very first one they did on this section of the street in Pepper Pike and that he used the same estimating method for the Cantors' property as similar projects in the past. He testified that ABV performed 12 to 15 sewer conversion projects between 2020 and 2021 in Pepper Pike. He was asked if he received complaints from any other customers but did not answer due to the objection from the Cantors' counsel.

{¶ 22} Regarding the remaining itemized charges in the final invoice, Cesare testified that Neil wished to use ABV's contractor for the work of pumping out the septic tank and Cesare added the contractor's bill to the invoice. Furthermore, the

septic tank to be demolished was located near a large old oak tree, five feet in diameter, which surrounded the entire tank. Because the only way to access the septic tank and demolish it properly would be to cut the oak tree down at a high cost, Cesare suggested to Neil that ABV would obtain permission from the county to fill the tank with premium stones instead of demolishing and excavating the tank. The county approved of the plan. Finally, a large lilac tree was in the path of the new sewer pipe and it had to be excavated and replanted.

{¶ 23} The sewer conversion project was completed in three days. The Cantors were home when ABV performed the work. Neil came out of the house to watch the work often, interacting with Cesare and his brother Bruno and asking questions. Neil watched the excavation and installation of the pipe up to the foundation of the house and never indicated any hesitation over the work. The Cantors were satisfied with the work, except for the sprinklers, which were dug up during the excavation.

{¶ 24} A week later, ABV sent the Cantors the final invoice of $20,195. Cesare testified that the invoice was "very fair" because the connection of the sewer pipe to the foundation of the house through the front yard involved significantly more work than the connection to the driveway and he charged on a time-and-materials basis. Neil wanted ABV to lower the price because he felt the price was unfair and unreasonable. He also claimed ABV damaged certain items which required repairment. The Cantors paid a total of $10,000 and refused to pay the remaining balance of $10,195.

**{¶ 25}** When asked why he did not put the additional work and charges in writing after the county inspector determined that the sewer pipe must be connected to the foundation of the house, Cesare testified as follows:

> Well, like I stated before, we are a small company. I was on the job all three days. We started in the morning and worked throughout the day and it just — there wasn't any time to go back and sit at my computer and do a proper cost analysis and come up with a price, because basically it was a  time-and-material basis for the extra work.  That's why I never — I don't have anything in writing for the additional work, but I was never told to stop. I was never told ["]give me numbers before you proceed["]. It was just an unspoken — I said, hey, we have got to do extra work; and when he told me, don't kill me and I trust you, I assumed that we had authorization to proceed to complete the work as required.

**{¶ 26}** Cesare testified he advised the Cantors that the additional work would be charged on a time-and-material basis, and he did not provide them with specific numbers ahead of time because the Cantors never asked him to put in writing the cost for the additional work.

**{¶ 27}** Under cross-examination, the defense counsel showed Cesare four proposals he submitted to other homeowners in Pepper Pike, in which the homeowners were quoted the price for the connection of the sewer pipe to the foundation of the house.  On redirect, Cesare explained that, in one of these proposals, he was asked by the homeowner to connect the sewer to the house; in the other proposals, the pipe was entirely underneath the grass, and in such cases, the sewer pipe is required to connect to the foundation of the house, regardless of whether it is a clay pipe.  The Cantors' house was different in that it had a circular driveway and he had been unaware that it was mandatory for clay pipes to be

replaced because in his experience, replacement of clay pipes was not always mandatory. Regarding his testimony that the county inspector determined that the existing clay pipe must be replaced, Cesare testified that he had not been aware that it was mandatory to replace clay pipes in all instances and acknowledged that he did not make any inquiry before the bidding.

### b. Bruno Frabotta

{¶ 28} Bruno Frabotta, Cesare's brother and founder and president of ABV, testified he started the company in 1974. He was also personally involved in the Cantors' sewer conversion project, being on the site during the entire project. He interacted with the Cantors throughout the project, they never stopped or complained about the work ABV was performing, and they seemed pleased with the result.[1]

### c. Neil Cantor

{¶ 29} The defense presented one witness. Neil, a retired dentist who has lived in the subject house for 45 years, testified that when Cesare came to his house to discuss the sewer conversion project, Cesare told his wife that "he was going to have to go to the foundation of the house." When ABV submitted its proposal, he understood he would pay $8,500 "plus contingencies" for the work. He did not recall ABV informing him that additional work would need to be performed but

---

[1] At the end of the testimony presented by ABV, the Cantors moved for directed verdict on the breach-of-contract and unjust-enrichment claims. The court denied the motion.

added that "it might have been said informally, but it was never said formally to me." When he received the final invoice, "it was like someone punching [him] in the solar plexus." He told Cesare that Cesare should have known before the project began that the piping must be connected to the foundation of the house. Regarding the charge for filling the septic tank with premium stone, he knew the county approved of it but did not understand why premium stone was necessary. He testified that he decided to pay $10,000 on the final invoice, $1,500 more than the original estimate.

{¶ 30} Neil testified that after the project was completed, the Pepper Pike mayor's secretary told him the mandate for replacing clay pipes went into effect in January 2020. He also testified that when he received the proposal, he did not question the scope of the proposal because he did not know what the requirements were and he "had confidence that ABV was going to comply."

{¶ 31} Neil acknowledged that he did not have a problem with the work performed by ABV. Asked if he could dispute the charges for the work, Neil stated "I can't dispute it because I have no idea." He also acknowledged the city of Pepper Pike provided $5,000 for reimbursement to residents for repairs to the yard, driveway, and shrubs, and he received $5,000 from the city. He admitted he authorized and approved of the additional work beyond the scope of the original proposal. He did not ask for written estimates for the additional work because it was not his responsibility to ask for them. He believed it was Cesare's responsibility to "broach that subject." When asked about the charge of replanting the large lilac tree,

Neil testified he did authorize the work but Cesare gave him the impression that he was doing them a favor.

## C. Manifest Weight of the Evidence

{¶ 32} The Cantors claim the jury's determination that they breached their contract with ABV in failing to pay the remaining balance of $10,195 for the sewer work is against the manifest weight of the evidence. While ABV argues the parties' contract had been modified by their conduct, the Cantors claim that they never assented to the scope of work or the price.

{¶ 33} "'Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'" *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). To establish a breach-of-contract claim, a party must demonstrate the nonbreaching party performed the contractual obligations, the other party failed to fulfill its contractual obligations without legal excuse, and the nonbreaching party suffered damages from the breach. *Carbone v. Nueva Constr. Group, L.L.C.*, 2017-Ohio-382, 83 N.E.3d 375, ¶ 14 (8th Dist.).

{¶ 34} Furthermore, "[p]arties may implicitly modify an agreement by their actions." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 39. A modification of the original agreement may be manifested by a continued, different course of performance. *Id.*

{¶ 35} Moreover, while there is a no-oral-modification clause in the July 2020 proposal, "no-oral-modification and written waiver provisions, like any other contractual provision, can be waived by the parties." *3637 Green Rd. Co. v. Specialized Component Sales Co.*, 2016-Ohio-5324, 69 N.E.3d 1083, ¶ 22 (8th Dist.), citing *e.g.*, *Snowville Subdivision Joint Venture Phase I v. Home S & L of Youngstown*, 8th Dist. Cuyahoga No. 96675, 2012-Ohio-1342, ¶ 15-17; *Home S & L of Youngstown v. Snowville Subdivision Joint Venture*, 8th Dist. Cuyahoga No. 97985, 2012-Ohio-4594, ¶ 29-31; and *Vivi Retail, Inc. v. E & A Northeast Ltd. Partnership*, 8th Dist. Cuyahoga No. 90527, 2008-Ohio-4705, ¶ 30 ("waiver of a contract term can occur when a party conducts itself in a manner inconsistent with an intention to insist on that term*"). See also Star Leasing Co. v. G&S Metal Consultants, Inc.*, 10th Dist. Franklin No. 08AP-713, 2009-Ohio-1269, ¶ 25 (noting the disfavor that courts have traditionally afforded no-oral-modification clauses in written contracts and the resulting principle that a no-oral-modification clause can be waived by oral agreement like any other term in a contract). Moreover, "the issue of whether a no-oral-modification clause is waived is a question of fact." *Kwikcolor Sand v. Fairmount Minerals Ltd.*, 8th Dist. Cuyahoga No. 96717, 2011-Ohio-6646, ¶ 19.

{¶ 36} The issue in this breach-of-contract case is whether the contract was modified to include the additional work required by the county. Regarding contract modification, the trial court instructed the jury as follows:

The terms of a contract may be changed upon the mutual agreement of the parties and may occur through words or conduct, expressly or by implication.

You may find that the parties intended to modify their contract when the County determined that more work would be required to make the sanitary sewer conversion project comply with County requirements.

In order to prove its claim, ABV must prove by the greater weight of the evidence that the parties agreed to modify their contract.

The Cantors claim that any modification of the contract's specifications had to be in writing. You may find, however, — you may find, however, that the Cantors waived that right by their own acts or or actions.

By waiver, we mean a voluntary relinquishment of a known right.

{¶ 37} The Cantors do not challenge the jury instructions regarding contract modification and waiver, but only that the jury's finding in favor of ABV is against the manifest weight of the evidence. ABV contends that the trial testimony establishes that the parties' contract was modified orally when Cesare Frabotta communicated to the Cantors that the county required the additional work beyond the scope of the original proposal and advised them of the time and materials basis for the additional cost.

{¶ 38} Having reviewed the trial transcript thoroughly, we agree that ABV introduced sufficient evidence to demonstrate that the parties' conduct implicitly modified their original contract and that the Cantors, by their conduct, waived the no-oral-modification clause. Neil was present at the site during the three-day period ABV performed the sewer conversion work. Cesare conversed with him throughout

the project and consulted with him regarding the necessity of additional work as the project progressed. Neil never challenged the additional work being performed.

{¶ 39} The Cantors also argue they did not agree to the increased price for the extended work. While the price is an essential element of a contract, when a contract for services does not specify the price to be paid, "'the law invokes the standard of reasonableness, and the fair value of the services is recoverable.'" *A N Bros. Corp. v. Total Quality, LLC*, 2016-Ohio-549, 59 N.E.3d 758, ¶ 27 (12th Dist.), quoting *Dixon v. Kittle*, 109 Ohio App. 257, 259, 164 N.E.2d 806 (4th Dist.1959) (where labor or materials are furnished upon request and no price is agreed upon, the law will imply an agreement to pay what they are reasonably worth), and *Dayton White Trucks, Inc. v. Fed. Pacific Elec. Co.*, 2d Dist. Montgomery No. 4885, 1975 Ohio App. LEXIS 6158, 3 (Sept. 30, 1975) (where a contract for services does not specify the price to be paid therefor, there is an implied promise to pay a reasonable price for such services). *See also Oglebay Norton Co. v. Armco, Inc.*, 8th Dist. Cuyahoga No. 54917, 1989 Ohio App. LEXIS 1365, 19 (Apr. 13, 1989) ("Generally, when a contract fails to mention price, the law implies that the parties intended a reasonable price.").

{¶ 40} Here, Cesare testified he advised Neil that the cost for the additional work would be based on a labor-and-materials basis. Cesare also testified at great length regarding each additional task itemized in the final invoice. The Cantors claim they did not consent to the total price of the work performed. They, however, presented no evidence to challenge the reasonableness of the cost calculated by ABV

on a labor-and-materials basis. Having reviewed the evidence presented at trial, we cannot say that the jury's finding in favor of ABV on its breach-of-contract claim is against the manifest weight of the evidence warranting a reversal of the jury verdict and a remand for a new trial. The fifth assignment of error is without merit.

### CSPA Claims and Damages for Violations

{¶ 41} In their counterclaim, the Cantors alleged ABV violated the CSPA. The CSPA is codified in R.C. 1345.01, et seq. R.C. 1345.02(A) states that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." The CSPA "prohibits unfair or deceptive acts or practices and unconscionable acts or practices by suppliers in consumer transactions." *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 29, 548 N.E.2d 933 (1990).

{¶ 42} "'A violation of the CSPA does not depend on any contractual or quasi-contractual claims; rather, it is a separate cause of action and legal claim.'" *Nelson v. Pieratt*, 12th Dist. Clermont No. CA2011-02-011, 2012-Ohio-2568, ¶ 12, quoting *Hudson-Wobbecke Ents., Inc. v. Burwell*, 5th Dist. Richland Nos. 06-CA-58 and 06-CA-50, 2007-Ohio-1728, ¶ 38.

{¶ 43} The Cantors alleged, and the jury found, that ABV engaged in deceptive practices in violation of Ohio Adm.Code 109:4-3-05(D)(3). The rule addresses when the supplier must obtain authorization from the consumer for price increases regarding any additional, unforeseen, but necessary repairs when the cost

of those repairs amounts to ten percent or more (excluding tax) of the original

estimate.  It states:

> (D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:
>
> * * *
>
> (3) Fail, in those cases where an estimate has been requested by a consumer, and the anticipated cost of the repair or service exceeds fifty dollars, to obtain oral or written authorization from the consumer for the anticipated cost of any additional, unforeseen, but necessary repairs when the cost of those repairs amounts to ten per cent or more (excluding tax) of the original estimate[.]

{¶ 44} Under the CSPA, a consumer claiming unfair or deceptive acts or

practices may rescind the transaction or recover "actual economic damages."

R.C. 1345.09(A).    Furthermore, the award of damages may be trebled.

R.C. 1345.09(B) provides that in certain cases, a consumer may recover "three times

the amount of the consumer's actual economic damages or two hundred dollars,

whichever is greater."[2]

---

[2] Treble damages may be awarded where

> the violation was an act or practice to be declared deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code[.]

R.C. 1345.09(B).

{¶ 45} The trial court, based on its determination that the Cantors did not suffer any actual economic damages, instructed the jury that if it was to find ABV to have violated the ten percent rule in Adm.Code 109:4-3-05(D)(3), it should award the statutory damages of $200 for the violation. ABV does not challenge the jury's finding that its conduct violated the rule.[3] The only CSPA issue on appeal is the amount of damages for ABV's violation.

{¶ 46} As the Supreme Court of Ohio explained, "statutory damages in the amount of $200 are an alternative to actual damages, and, thus, $200 is the minimum award for a CSPA violation under R.C. 1345.09(B). In other words, if actual damages are not proven or if three times the consumer's damages is less than $200, then $200 will be awarded." *Whitaker v. M.T. Automotive, Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, 855 N.E.2d 825, ¶ 17. Accordingly, if the Cantors cannot prove actual economic damages, they will be awarded the statutory award of $200 for ABV's violation of the CSPA.

---

[3] We note that the first sentence of the July 2020 proposal provides the specific scope of the contract as connecting the sewer to the edge of the driveway and provides an estimated contract price of $8,500 for the work. While the final invoice price is $20,195, substantially exceeding ten percent of the original estimate, there was no estimate given for the pipe from the edge of the driveway to the foundation of the house. The Cantors never requested an estimate for the additional work, and therefore, it would be impossible to apply Adm.Code 109:4-3-05 to determine if the cost exceeds the original estimate. *See Sterling Constr., Inc. v. Alkire*, 12th Dist. Madison No. CA2016-12-032, 2017-Ohio-7213, ¶ 10 (the homeowner never requested an estimate from the contractor and therefore, it is impossible to apply Ohio Adm.Code 109:4-3-05(D)(3) to the case at bar; "there is insufficient evidence to establish that more than a 10% increase occurred when no original estimate was provided"). ABV, however, does not challenge the jury's finding.

{¶ 47} While the Cantors argue their actual economic damages is $10,195, the remaining balance of the invoice, the trial court determined that the Cantors failed to prove that they suffered actual economic damages and instructed the jury that, if it found ABV to have violated the CSPA, it should award $200 for the violation. Under the first and second assignments of error, the Cantors argue the trial court erred in not allowing them to recover the remaining balance of the invoice as the actual economic damages and in failing to award treble damages ($30,585) pursuant to R.C. 1345.09(B).

## A. Whether Appellants Proved Actual Economic Damages

{¶ 48} Under both assignments of error, the issue is whether the Cantors proved they suffered actual economic damages in the amount of $10,195. If they failed to prove it, the statutory award of $200 would be appropriate as damages for ABV's violation of the CSPA.

{¶ 49} The trial court's application of a measure of damages presents a legal question subject to a de novo review. *Younker v. Hayes*, 2018-Ohio-835, 108 N.E.3d 258, ¶ 13 (9th Dist.). *See also Fleischer v. George*, 9th Dist. Medina No. 09CA0057-M, 2010-Ohio-3941, ¶ 18 (whether treble damages under the CSPA are appropriate is a question of law and is reviewed de novo).

{¶ 50} Pursuant to R.C. 1345.09(G), "actual economic damages" for purpose of the CSPA means "damages for direct, incidental, or consequential pecuniary losses resulting from a violation of Chapter 1345 of the Revised Code * * *."

{¶ 51} The Cantors contend that $10,195 was their actual economic damages resulting from ABV's violation of the CSPA. The Cantors effectively claim that they are damaged to the extent of the amount they still owed under the invoice after paying $10,000 toward the sewer conversion work, without presenting evidence to show that the price of the work performed by ABV should be $10,000 and therefore any excess amount would be considered their loss.

{¶ 52} Our research does not reveal any case law supporting the Cantors' claim that the actual economic damages for ABV's violation of the ten percent rule under the circumstances of this case is the remaining balance they owed, where the work had been performed to their satisfaction. The Cantors cite *Fleischer*, *supra*, to support their claim. In that case, however, plaintiff homeowner presented evidence of expenditures he undertook due to the defendant contractor's violation of the CSPA. The expenditures included hiring a new general contractor to complete the defective construction, payments to the unpaid subcontractors, and payments for architect reports to evaluate the condition of the construction project. As such, *Fleischer* is not applicable. Accordingly, we agree with the trial court's determination that the Cantors failed to prove that they suffered actual economic damages of $10,195 for purposes of R.C. 1345.09(A).

{¶ 53} "In order to award treble damages, there must be a finding of actual damages." *Williams v. Kia of Bedford*, 2018-Ohio-283, 104 N.E.3d 924, ¶ 24 (8th Dist.). Because the Cantors failed to prove actual economic damages resulting from ABV's CSPA violation, the trial court appropriately determined that the jury should

award $200 in statutory damages should it find ABV to have violated the CSPA. The first and second assignments of error are without merit.

### B. Attorney Fees: Whether Appellee's Violation of the CSPA Is a "Bona Fide Error"

{¶ 54} The third and fourth assignments concern attorney fees. After the trial, the Cantors moved for an award of attorney fees pursuant to R.C. 1345.09(F)(2) and the trial court denied it.

{¶ 55} Under the CSPA, the court may award a prevailing consumer a reasonable attorney fee if the supplier "has *knowingly* committed an act or practice that violates [the CSPA]." (Emphasis added.) R.C. 1345.09(F)(2).

{¶ 56} However, R.C. 1345.11(A) provides for a defense for the supplier.

> [I]f a supplier shows by a preponderance of the evidence that a violation resulted from a *bona fide* error notwithstanding the maintenance of procedures reasonably adopted to avoid the error, * * * no party shall be awarded attorney's fees, and monetary recovery shall not exceed the amount of actual damages resulting from the violation.

(Emphasis added.) R.C. 1345.11(A).

{¶ 57} Here, the jury, through its answer to the interrogatories, found in favor of the Cantors on the CSPA claim, finding that ABV failed to provide an estimate to the Cantors for the anticipated cost of additional work exceeding ten percent of the original estimate, in violation of R.C. 1345.02(A). The jury also found ABV violated the CSPA "knowingly." However, it found the violation to be a "bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error."

{¶ 58} The Cantors argue that the jury's finding that ABV's violation "resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error," which precluded attorney fees, is against the manifest weight of the evidence. They argue there was no evidence presented to indicate that ABV had any procedures in place to avoid the Adm.Code 109:4-3-05(D)(3) violation or that the violation was a result of deviations from the procedure. The Cantors also argue the jury's finding that ABV knowingly violated the CSPA is irreconcilable with the finding that the violation was a bona fide error. They contend that, because the violation did not result from a bona fide error, they should be awarded attorney fees pursuant to R.C. 1345.09(F)(2).

{¶ 59} "A bona fide error is one made in good faith, despite procedures to avoid the error." *Anousheh v. Planet Ford, Inc.*, 2d Dist. Montgomery Nos. 21960 and 21967, 2007-Ohio-4543, ¶ 26. ABV contends they showed by a preponderance of the evidence that the violation resulted from a bona fide error. The original proposal contemplates a procedure where any work in deviation from the specifics provided in the proposal to be performed only upon written instructions. ABV admitted there was no written instruction for any additional work, but it points to Cesare's testimony that ABV verbally appraised Neil Cantor immediately of the necessity of any additional task whenever it arose before proceeding to perform the work. Cesare also testified that the excavation work was performed within a three-day period of time and he was on the site the entire time without the ability to return to the office to prepare a written proposal for each additional unforeseen deviation

from the original proposal. The jury found ABV, while violating Adm.Code 109:4-3-05(D)(3), acted in good faith despite the procedure in place to avoid the CSPA violation. Applying the manifest-weight standard, we cannot say that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

{¶ 60} The Cantors also argue the jury's finding that ABV violated the CSPA "knowingly" is irreconcilable with its finding that the violation was a bona fide error. The jury found ABV knowingly proceeded to perform the additional work without a written estimate in violation of Ohio Adm.Code 109.4-3-05(D)(3), but it did so in good faith.

{¶ 61} For purposes of R.C. 1345.09(F), "knowingly" means that the "'supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law * * *.'" *Parks v. Aburahma*, 2022-Ohio-4253, 202 N.E.3d 92, ¶ 15 (11th Dist.), quoting *Einhorn,* 48 Ohio St.3d at 30, 548 N.E.2d 933.

{¶ 62} To award attorney fees to a consumer under the CSPA, the trial court must find that the supplier knowingly committed an act or practice that violated the CSPA *and that* no bona fide error defense in R.C. 1345.11(A) applies. *Shumaker v. Hamilton Chevrolet, Inc.*, 184 Ohio App.3d 326, 2009-Ohio-5263, 920 N.E.2d 1023, ¶ 16 (4th Dist.). The "knowingly" finding and the "bona fide error" finding are separate and distinct. Accordingly, we find no merit to the Cantors' argument that once the jury found that ABV knowingly performed additional work without

providing an estimate, it must also find the act was not committed in good faith.[4]
The third and fourth assignments of error are overruled.

{¶ 63} For all the foregoing reasons, we affirm the judgment of the trial court.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover of appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[4] The Cantors cite *Swift v. Allied Pest Control, Inc.*, 2d Dist. Montgomery No. 18311, 2001-Ohio-1462, to support their claim. Our review, however, indicates *Swift* is distinguishable. In that case, while defendant pest control company applied the pesticide outside the house, the chemical leaked into the basement. The company's employees may have been aware of it but did nothing to remedy the problem and told the homeowners it was safe to stay in the house. A few days later, an employee came to clean the areas with a bleach mixture but failed to follow the instructions for its proper application. The homeowners subsequently suffered significant health problems. The jury was asked in interrogatory regarding the following allegedly unfair/deceptive acts: (1) representation to the homeowners that the work would be performed in accordance with all regulations; (2) a failure to inform the homeowners of the spill immediately; and (3) misinforming them of the safety of the home. The jury was also asked regarding the following unconscionable acts: specifically informing the homeowners that (1) it was safe to remain in their home after the spill and that (2) the chemical had been cleaned up. The jury found that "an unconscionable act was knowingly committed," and that "an unfair/deceptive act was committed, and that 'the' violation was the result of a bona fide error." After reviewing several cases involving findings of "knowingly" and "bona fide error," the court in *Swift* concluded that "*under the facts of this case*, the interrogatories are contradictory and insufficient to reach a conclusion on the issue of treble damages and attorney fees." (Emphasis added.) *Id.* at 14. *Swift* is not applicable here.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MICHELLE J. SHEEHAN, PRESIDING JUDGE

LISA B. FORBES, J., and
MICHAEL JOHN RYAN, J., CONCUR