[Cite as *Estate of Gregory v. QDP Wholesale Auto, L.L.C.*, 2025-Ohio-1979.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

ESTATE OF SHARON L. GREGORY,

Plaintiff,

v.

QDP WHOLESALE AUTO, LLC ET AL.,

Defendant,

MLJ GROUP, LLC,

Third-Party Defendant-Appellant,

v.

WESTERN RESERVE TITLE & ESCROW AGENCY, INC.,

Third-Party Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 MA 0087

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2022 CV 02291

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

*Atty. J. Michael Thompson* and *Atty. Joseph N. Spano*, Henderson, Covington, Messenger, Newman & Thomas Co., L.P.A., for Plaintiff and

*Atty. Karly B. Johnson*, Manchester Newman & Bennett, L.P.A, for Third-Party Plaintiff-Appellant and

*Atty. Melany A. Kotlarek, Atty. Andrew J. Dorman* and *Atty. Brianna M. Prislipsky,* Reminger Co., L.P.A., for Third-Party Defendant-Appellee.

Dated:  June 2, 2025

_____

**DICKEY, J.**

**{¶1}**   Appellant, MLJ Group, LLC ("MLJ Group") appeals from the August 21, 2024 judgment of the Mahoning County Court of Common Pleas granting summary judgment in favor of Appellee, Western Reserve Title & Escrow Agency, Inc. ("Western Reserve Title").

**{¶2}**   The allegations in this suit arise out of a real estate transaction which occurred between Plaintiff, Estate of Sharon L. Gregory (the "Estate"), and Defendants QDP Wholesale Auto, LLC ("QDP") and MLJ Group.  The Estate alleges generally that QDP forged a deed claiming that it owned property belonging to the decedent, after the decedent had rejected multiple offers to sell the property, and then used that deed to effectuate a sale to MLJ Group.  By way of a third-party claim, MLJ Group alleges it hired Western Reserve Title to perform a title search prior to its valid purchase of the decedent's property and procure title insurance on its behalf.  Western Reserve Title completed its title search, which showed no encumbrances, and advised MLJ Group accordingly.

**{¶3}**   Western Reserve Title had originally offered escrow services.  However, MLJ Group later unilaterally changed its mind and advised Western Reserve Title that it intended to proceed with a cash only closing.  While Western Reserve Title also offered to procure title insurance for the transaction, which would come from the escrow funds of both buyer and seller, it did not do so, given MLJ Group's decision to proceed with a cash only closing.  Western Reserve Title advised MLJ Group that it would record the deeds as agreed upon, but that MLJ Group would otherwise be responsible for paying all fees associated with the sale, given that Western Reserve Title would not be handling the sale

funds. Subsequent to the sale, MLJ Group brought a third-party claim against Western Reserve Title alleging it was negligent in performing its title search and not procuring title insurance despite MLJ Group's decision to proceed with a cash only closing, thereby changing the terms of the parties' original escrow agreement.

**{¶4}** Western Reserve Title filed a motion for summary judgment on those claims, as its sole contractual duty was to perform a title search, which did not require investigation into whether any of the documents in the chain of title were themselves valid, and that it was not required to procure title insurance, due to MLJ Group's decision to proceed with a cash only closing. The trial court granted Western Reserve Title's motion for summary judgment.

**{¶5}** On appeal, MLJ Group raises three assignments of error: (1) the trial court erred in granting summary judgment in favor of Western Reserve Title where there was a genuine issue of material fact as to whether Western Reserve Title breached contractual obligations to MLJ Group when it failed to purchase title insurance on MLJ Group's behalf; (2) the trial court erred in granting summary judgment in favor of Western Reserve Title because regardless of whether there was a valid contract between the parties, there is a genuine issue of material fact as to whether Western Reserve Title breached any independent duties owed to MLJ Group not to negligently or fraudulently mislead MLJ Group into believing that it would secure title insurance; and (3) the trial court erred in granting summary judgment in favor of Western Reserve Title because the Ohio Rules of Civil Procedure permit pleading in the alternative and, to the extent that there is no enforceable contract, there is a genuine issue of material fact as to whether Western Reserve Title is liable under theories of professional negligence, promissory estoppel, and fraud.

**{¶6}** Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

**{¶7}** MLJ Group maintains 16 investment properties in Mahoning County, Ohio. Its sole member is Leonardo Matos, Jr. ("Matos"). MLJ Group contracts with DeMar Realty & Property Management Services ("DeMar") to manage its investment properties. In November 2021, DeMar's employee, Tracy Baron ("Baron"), showed a rental to Robert

Lee Evans ("Evans") and Tanisha Thomas. During the showing, Evans told Baron he had his own investment properties he was seeking to sell. Baron put Evans in contact with Matos.

**{¶8}** Matos and Evans initially discussed MLJ Group's potential purchase of QDP's investment properties. Evans advised Matos that he had purchased the investment properties from an elderly widow. MLJ Group agreed to purchase 54 Glacier Avenue in Youngstown, Ohio for $13,500 and 157 North Belle Vista Avenue in Youngstown, Ohio for $28,000 (the "Properties").

**{¶9}** Matos insisted that the two transactions be conducted through his realtor, Maureen Spear ("Spear"). Spear provided the parties with two purchase contracts which were executed by Evans on behalf of QDP and Matos on behalf of MLJ Group. Both purchase contracts provided for the acquisition of title insurance through Western Reserve Title, a title company located in Mahoning County, Ohio. The signed purchase contracts were then transmitted by Spear to Western Reserve Title.

**{¶10}** In November 2022, Matos and Evans met at Western Reserve Title in order for Evans to execute the deeds. Western Reserve Title was retained by Spear to complete a title exam, prepare a title commitment, and conduct the closing of the Properties that MLJ Group was purchasing from QDP. Western Reserve Title completed the title exams and title commitments. Western Reserve Title sent the corresponding U.S. Department of Housing & Urban Development Settlement Statements ("Settlement Statements") to the parties for electronic signature to complete the closings for the Properties, finding no apparent errors in the chain of title.

**{¶11}** The Settlement Statements indicated the services Western Reserve Title would perform as an escrow agent, including fees for wiring and recording the deeds, prorated taxes, as well as a $175 charge to procure title insurance and a $50 title insurance binder, to be split between the parties. The distribution of funds noted in the Settlement Statements was contingent upon Western Reserve Title acting as an escrow agent in which it would be able to pay those fees from the sale price of the Properties. Pursuant to the Settlement Statements, the title insurance payment and binder were meant to be paid with joint funds from both buyer and seller at the closing.

{¶12} The Settlement Statement for the Glacier Property indicated that both parties owed $87.50 for title insurance. It further stated that both parties owed $326.96 in prorated county taxes, $150 for the settlement fee, and $25 for a title insurance binder. It stated that MLJ Group owed $25 for a wire fee and $34 for a recording fee, while QDP owed $300 for a title examination fee, $25 for document preparation, $50 in attorney's fees, and $54.50 for city/county tax/stamps. MLJ Group executed the Settlement Statement for the Glacier Property on November 25, 2022. QDP executed the Settlement Statement for the Glacier Property also on that same date.

{¶13} The Settlement Statement for the Belle Vista Property indicated that both parties owed $87.50 for title insurance. It further stated that both parties owed $538.13 in prorated county taxes, $150 for the settlement fee, and $25 for a title insurance binder. It stated that MLJ Group owed $25 for a wire fee and $34 for a recording fee, while QDP owed $300 for a title examination fee, $25 for document preparation, $50 in attorney's fees, and $112.50 for city/county tax/stamps. MLJ Group executed the Settlement Statement for the Belle Vista Property on November 25, 2022. QDP executed the Settlement Statement for the Belle Vista Property also on that same date.

{¶14} Also on November 25, 2022, Evans contacted Matos requesting that MLJ Group disburse the funds directly to QDP, rather than having them go through an escrow agent (Western Reserve Title) due to a purported family emergency. Matos contacted Elizabeth McNamee ("McNamee") with Western Reserve Title via email that same Friday in the afternoon inquiring about giving QDP a direct check. Matos indicated in that email, "Mr. Lee [with QDP] would like me to give him a check direct is that ok?" (Exhibit 5). Matos never asked what effect or potential consequences a cash only closing would have on the parties' original escrow agreement. McNamee replied that in the event that MLJ Group elected to pay QDP directly, all fees would be its responsibility and that it would not receive a tax proration, specifically stating: "If you want to pay him directly I can invoice you for my work. But you won't get a tax proration and all fees will be your responsibility. Up to you. Let me know. I can get you an invoice and once paid we'll record the deeds." (Exhibit 5).

{¶15} Thus, MLJ Group decided to change the terms of the parties' original escrow agreement and proceed with a cash only closing. Matos advised Western

Reserve Title that MLJ Group would pay QDP for the purchase directly. Therefore, Western Reserve Title's services as a settlement/escrow agent were no longer required.

{¶16} McNamee further indicated she would charge MLJ Group for her work up to that point and would record the deeds, but that any further work towards finalizing the sale would fall on MLJ Group, including the payment of fees, since Western Reserve Title would not be handling the settlement funds. McNamee also advised Matos that she would prepare invoices for MLJ Group to reflect the change in services due to MLJ Group's decision to proceed with a cash only closing. Thus, Western Reserve Title did not conduct the closing and did not disburse the funds as indicated in the drafts of the Settlement Statements pursuant to MLJ Group's request. Western Reserve Title did not sign the proposed Settlement Statements because MLJ Group rejected any escrow services due to the cash only closing. As a result, no further duty fell on Western Reserve Title as the duty in this case flipped to the buyer (MLJ Group) to make any inquiry. However, MLJ Group made no further inquiry about the services, if any, Western Reserve Title would perform in light of the fact that MLJ Group terminated their services as the escrow agent. MLJ Group unilaterally canceled the parties' agreement for escrow services via email and no further agreements existed.

{¶17} On November 26, 2022, MLJ Group tendered payment to QDP. Three days later, Western Reserve Title recorded the deeds. Western Reserve Title had issued invoices to MLJ Group for its services relating to the Properties that are specifically listed as title exam, attorney fee, recording, transfer tax, and title commitment. None of these provisions related to the procurement of title insurance or otherwise referenced insurance, as Western Reserve Title did not handle the closing and consequently could not pay the fees associated with insurance, including the $50 insurance binder and $150 insurance payment that had been initially quoted on the Settlement Statements. Thus, the invoices reflected various inconsistencies with the Settlement Statements because: (1) MLJ Group had accepted sole responsibility for paying all fees and costs; (2) MLJ Group agreed to pay the purchase price directly to QDP; and (3) certain costs were presumably no longer applicable.

{¶18} Matos concedes MLJ Group received the invoices. However, Matos claims he did not review them in detail, despite MLJ Group's last-minute decision to unilaterally

change the course and scope of Western Reserve Title's work. Matos did, however, note that the invoices contained fewer line items than the Settlement Statements had, reflecting MLJ Group's decision to proceed with a cash only closing rather than the original agreed upon escrow arrangement. Although included on the Settlement Statements, neither title insurance nor the insurance binder fee are listed on the invoices. MLJ Group did not receive any further documentation or correspondence from Western Reserve Title indicating that it had obtained title insurance on its behalf.

**{¶19}** After MLJ Group paid the invoices, MLJ Group claims that one of its tenants contacted and advised it of an apparent dispute as to the proper owner of the Properties. At that point, Matos reviewed the sale documents and realized that MLJ Group had no title insurance documents. Matos contacted Western Reserve Title to inquire as to the policies. Matos was advised that because MLJ Group elected to pursue a cash only closing and handle all other fees itself, Western Reserve Title had not purchased title insurance on its behalf, as reflected on the invoices.

**{¶20}** After realizing that Western Reserve Title had not purchased title insurance, MLJ Group attempted to procure coverage. However, due to the dispute with QDP and the Estate, MLJ Group was unable to do so. Although Matos claims that MLJ Group never intended to forgo insurance coverage, the correspondence between himself and McNamee reveals that it was MLJ Group's sole decision to discharge Western Reserve Title of any escrow and closing duties, including the purchase of title insurance with the purchase funds, by proceeding with a cash only closing. This point was further reflected on the invoices MLJ Group received, but failed to review, before paying in full.

**{¶21}** On December 30, 2022, the Estate filed a complaint against QDP, MLJ Group, and others alleging eight counts: (1) Civil RICO; (2) Fraud; (3) Conversion; (4) Civil Action for Theft; (5) Slander of Title; (6) Alter Ego; (7) Declaratory Judgment; and (8) Injunctive Relief. The claims stem from allegations that QDP and MLJ Group filed fraudulent title documents and improperly held themselves out as the owners of property belonging to the Estate.

**{¶22}** On March 31, 2023, MLJ Group filed an answer, cross-claims, and a third-party complaint asserting claims against Western Reserve Title. MLJ Group alleged that QDP had sold the Properties to it, improperly representing that it was the owner. MLJ

Group claimed it had engaged Western Reserve Title to conduct a title search and obtain title insurance. MLJ Group alleges, however, that Western Reserve Title failed to discover the fraudulent deed filed by QDP. MLJ Group further alleged that Western Reserve Title failed to procure title insurance on its behalf, asserting claims for professional negligence, breach of contract, promissory estoppel, and fraud.

**{¶23}** On September 14, 2023, Western Reserve Title filed an answer to MLJ Group's third-party complaint. Mediation resulted in an impasse.

**{¶24}** On May 15, 2024, Western Reserve Title filed a motion for summary judgment alleging that MLJ Group's claims were barred because: (1) its negligence claim was precluded by the economic loss doctrine due to the existence of an underlying contract; (2) its breach of contract claim failed due to the lack of an affirmative obligation on Western Reserve Title's behalf to investigate the validity of each document in the chain of title or procure title insurance; (3) the promissory estoppel claim failed both due to the existence of a valid and enforceable contract; and (4) MLJ Group's fraud claim was barred both by the economic loss doctrine and the lack of any evidence of a misrepresentation or material omission by Western Reserve Title.

**{¶25}** On June 20, 2024, MLJ Group filed a response in opposition arguing that Western Reserve Title had an independent duty to procure title insurance. One week later, Western Reserve Title filed a reply in support of its motion for summary judgment. Western Reserve Title made it clear that when a buyer such as MLJ Group elects to proceed with the closing of a property on its own and without a settlement or escrow agent, a title agent such as Western Reserve Title has no further duties in finalizing a sale.

**{¶26}** The trial court granted Western Reserve Title's motion for summary judgment finding there was no dispute that MLJ Group elected to forego title insurance by its decision to proceed with a cash only closing. The court ultimately issued a final appealable order on August 21, 2024, stating:

> . . . [T]he following facts are not in dispute. MLJ Group initially retained Western Reserve Title to complete the title search of the properties located at 54 Glacier Avenue and 157 North Belle Vista Ave in Youngstown (the "Properties") and to conduct the closing of the Properties. Western

Case No. 24 MA 0087

Reserve Title completed the title searches of the Properties, which showed a prior deed in the chain-of-title of each property that the Plaintiff in this case now alleges to contain a forged signature. Western Reserve Title also prepared the Settlement Statements of the funds that Western Reserve Title would disburse at the Properties' closing, which included title insurance. After Western Reserve Title prepared the Settlement Statements, MLJ Group elected to forego having Western Reserve Title conduct the closings of the Properties and advised Western Reserve Title it was proceeding instead with a cash closing on its own. As a result, Western Reserve Title did not distribute any funds set forth on the Settlement Statement, including those for title insurance. MLJ Group does not claim and has not produced any evidence that MLJ Group paid Western Reserve Title for title insurance. Western Reserve Title produced the invoices for services it provided to MLJ Group which did not show or reflect a payment for title insurance.

MLJ Group claims that Western Reserve Title breached an implied-in-fact or oral contract or was otherwise under a duty to affirmatively tell MLJ Group that once it was terminated as the settlement/escrow agent and did not conduct the closings, that Western Reserve Title would not be disbursing funds set forth on the Settlement Statements for title insurance. MLJ has not cited to any law in support of this contention.

When MLJ Group chose to proceed with the closings for the Properties on its own, there was no consideration as MLJ Group did not pay for title insurance. Further, MLJ Group was in breach of any contract as it did not pay for title insurance. As a matter of Ohio law, when Western Reserve Title was no longer handling the closing of the Properties, it was no longer under any independent duty to disburse funds for title insurance that were set forth in the settlement statements. *Johnson v. U.S. Title Agency, Inc.,* 2017-Ohio-2852, 91 N.E.3d 76, ¶ 45 (8th Dist.); *Eller Media Co. v. DGE, Ltd.,* 8th Dist. Cuyahoga Nos. 83273, 83286, 2004-Ohio-4748,

¶ 45-46. Therefore, there can be no claim made-contractual or otherwise as a matter of law against Western Reserve Title.

Further, to the extent MLJ Group makes claims regarding the title search Western Reserve Title completed of the Properties, it fails. By law, a title search does not include the rendering of an opinion as to the validity of the title. *Heritage Way Properties, LLC v. Disbennett,* 4th Dist. Ross No, 10CA3190, 2011-Ohio-2004, ¶ 15 *citing Deutsche Bank Natl. Trust Co. v. Pevarski,* 187 Ohio App.3d 455, 2010 785, P56, 932 N.E.2d 887. This is because even a thorough title examination could not discover "off-record" defects including non-delivery of a deed, forged deeds, void judgments, and erroneous public records as that is what title insurance policies would cover. *12B Purchase and Sale of Real Properly §35.03.*

Construing the evidence most strongly in favor of MLJ Group, the Court finds that reasonable minds can come to but one conclusion and that conclusion is adverse to MLJ Group on its claims with regard to Western Reserve Title. There is no genuine issue as to any material fact, and Western Reserve Title is entitled judgment as a matter of law.

In accordance with Civ.R. 54(B), there is no just reason for delay and this Amended Order shall constitute final judgment with respect to each of MLJ Group's claims against Western Reserve Title.

IT IS SO ORDERED.

(8/21/2024 Judgment Entry, p. 1-3).

**{¶27}** MLJ Group filed a timely appeal and raises three assignments of error.

## SUMMARY JUDGMENT STANDARD OF REVIEW

An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d

102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

"[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293, 662 N.E.2d 264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327, 364 N.E.2d 267.

*Doe v. Skaggs*, 2018-Ohio-5402, ¶ 10-12 (7th Dist.).

<u>ASSIGNMENT OF ERROR NO. 1</u>

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHERE THERE WAS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER WESTERN RESERVE BREACHED CONTRACTUAL OBLIGATIONS TO MLJ GROUP WHEN IT FAILED TO PURCHASE TITLE INSURANCE ON MLJ GROUP'S BEHALF.**

**{¶28}** In its first assignment of error, MLJ Group contends the trial court erred in granting summary judgment in favor of Western Reserve Title because Western Reserve Title breached contractual obligations to MLJ Group by not purchasing title insurance on MLJ Group's behalf. MLJ Group alleges there is at least a genuine issue of material fact as to whether there was an implied-in-fact contract between Western Reserve Title and MLJ Group for Western Reserve Title to perform MLJ Group's title examination and purchase title insurance on MLJ Group's behalf. MLJ Group stresses it paid Western Reserve Title $1,335 in consideration for Western Reserve Title's services. MLJ Group believes the parties agreed to a minor modification of the escrow agreement, i.e., that MLJ Group would pay QDP directly, as revealed in the email exchange between Matos and McNamee regarding a cash only closing.

**{¶29}** In Ohio, there are three types of contracts: (1) express; (2) implied-in-fact; and (3) implied-in-law. *N. Side Bank & Trust Co. v. Trinity Aviation, LLC,* 2020-Ohio-1470, ¶ 14 (1st Dist), citing *Linder v. Am. Natl. Ins. Co.*, 2003-Ohio-5394, ¶ 18 (1st Dist.), citing *Legros v. Tarr*, 44 Ohio St.3d 1, 6 (1989). At issue here, "[i]mplied-in-fact contracts require a showing of assent, but a court otherwise construes surrounding facts and circumstances to determine the scope of the agreement." *Id.*

**{¶30}** "'In order to recover on a claim of breach of contract, the plaintiff must prove (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff.'" *Williams v. Edgell*, 2024-Ohio-2129, ¶ 71 (7th Dist.), quoting *Price v. Dillon*, 2008-Ohio-1178, ¶ 44 (7th Dist.).

**{¶31}** "'A contract can be modified when there is clear and convincing evidence of the parties' mutual intent to modify the contract through their course of dealing.'" *Dye*

*v. J.J. Detweiler Enters., Inc.*, 2022-Ohio-3250, ¶ 79 (5th Dist.), quoting *Third Fed. S. & L. Assn. of Cleveland v. Formanik*, 2014-Ohio-3234, ¶ 13 (8th Dist.), citing *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 2012-Ohio-1942, ¶ 24-25 (8th Dist.). "Furthermore, '[p]arties may implicitly modify an agreement by their actions.' *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 39. A modification of the original agreement may be manifested by a continued, different course of performance. *Id.*" *ABV Corp. v. Cantor*, 2023-Ohio-3363, ¶ 34 (8th Dist.).

> "An escrow is a matter of agreement between parties, usually evidenced by a writing placed with a third-party depository providing certain terms and conditions the parties intend to be fulfilled prior to the termination of the escrow." *Pippin v. Kern–Ward Bldg. Co.* (1982), 8 Ohio App.3d 196, 198, 8 OBR 266, 456 N.E.2d 1235. See also *Waffen v. Summers,* 6th Dist. No. OT–08–034, 2009-Ohio-2940, 2009 WL 1741731, ¶ 29; *Janca v. First Fed. S. & L. Assn. of Cleveland* (1985), 21 Ohio App.3d 211, 213, 21 OBR 225, 486 N.E.2d 1216. "Escrow is controlled by the escrow agreement, placing the deposit beyond the control of the depositor and earmarking the funds to be held in a trust-like arrangement." *Pippin* at paragraph two of the syllabus. The escrow agent owes the parties a duty to carry out the terms of the agreement as intended by the parties. *Hurst,* 157 Ohio App.3d 133, 2004-Ohio-2307, 809 N.E.2d 689, at ¶ 40, citing *Pippin. . . .*

*Spalla v. Fransen*, 2010-Ohio-3461, ¶ 32 (11th Dist.).

{¶32} Regarding the doctrine of caveat emptor (let the buyer beware), the Supreme Court of Ohio in *Layman v. Binns*, 35 Ohio St.3d 176 (1988), stated:

> The doctrine of *caveat emptor* is one of long standing. . . . [T]he doctrine performs a function in the real estate marketplace. Without the doctrine nearly every sale would invite litigation instituted by a disappointed buyer. . . . A duty falls upon the purchaser to make inquiry and examination.

*Id.* at 177.

**{¶33}** As stated, the two purchase contracts at issue here, with MLJ Group as the buyer, provided for the acquisition of title insurance through Western Reserve Title. The Settlement Statements indicated the services Western Reserve Title would perform as an escrow agent. The distribution of funds noted in the Settlement Statements was contingent upon Western Reserve Title acting as an escrow agent in which it would be able to pay the requisite fees from the sale price of the Properties.

**{¶34}** Evans contacted Matos requesting that MLJ Group disburse the funds directly to QDP, rather than having them go through an escrow agent (Western Reserve Title) due to a purported family emergency. MLJ Group decided to change the terms of the parties' original escrow agreement and proceed with a cash only closing. Matos advised Western Reserve Title that MLJ Group would pay QDP for the purchase directly. Thus, Western Reserve Title's services as a settlement/escrow agent were no longer required.

**{¶35}** Because MLJ Group elected to proceed with a cash only closing, it opted out of escrow services. MLJ Group's belief that Western Reserve Title owed it a duty to procure title insurance after MLJ Group decided to proceed with a cash only closing is misplaced under Ohio law. If MLJ Group would have gone through with the escrow arrangement as originally planned, Western Reserve Title would have obtained title insurance using a portion of the sale's funds towards the insurance binder and premium, with buyer and seller splitting those fees equally.

**{¶36}** When MLJ Group advised Western Reserve Title that it would be proceeding with a cash only closing, Western Reserve Title advised MLJ Group that it would proceed with recording the deeds, but that MLJ Group would be responsible for payment and all fees going forward. At that point, MLJ Group knew, or should have known, that Western Reserve Title would not be purchasing title insurance on its behalf as it would not be handling the closing transaction. McNamee advised Matos that she would prepare invoices for MLJ Group to reflect the change in services due to MLJ Group's decision to proceed with a cash only closing. Thus, Western Reserve Title did not conduct the closing and did not disburse the funds as indicated in the drafts of the Settlement Statements pursuant to MLJ Group's request. Western Reserve Title did not

sign the proposed Settlement Statements because MLJ Group rejected any escrow services.

**{¶37}** After MLJ Group proceeded with the cash only closing, Western Reserve Title presented it with invoices related to its title search and recording services which MLJ Group paid. Matos claims he did not review the invoices in detail. Matos did, however, note that the invoices contained fewer line items than the Settlement Statements had, reflecting MLJ Group's decision to proceed with a cash only closing rather than an escrow arrangement. Although included on the Settlement Statements, neither title insurance nor the insurance binder fee are listed on the invoices. MLJ Group did not receive any further documentation or correspondence from Western Reserve Title indicating that it had obtained title insurance on its behalf. If MLJ Group had properly read the invoices it received, it would have realized it was not billed for any insurance services and that Western Reserve Title did not obtain title insurance on its behalf. Western Reserve Title is not liable for MLJ Group's negligence in failing to properly review the invoices. If MLJ Group had any confusion or questions involving either the email exchange between Matos and McNamee or the invoices sent by Western Reserve Title, "[a] duty [fell] upon the purchaser [MLJ Group] to make inquiry and examination." *Layman*, 35 Ohio St.3d at 177. MLJ Group unilaterally canceled the parties' agreement for escrow services via email and no further agreements existed. However, MLJ Group did not ask any further questions about what effect canceling the escrow services would have or what services, if any, Western Reserve Title would perform in light of the canceled contract. MLJ Group made no inquiry after receiving the invoices about any line items or what certain costs were for or why certain things were billed or not billed. MLJ Group even admitted to paying the invoices without looking at them despite its duty to examine under *Layman*. *See Id.*

**{¶38}** MLJ Group believes there is an ambiguity as to the extent of the parties' agreement due to the services listed on the Settlement Statements. However, MLJ Group unilaterally elected to proceed with a cash only closing, thereby making some of the listed services irrelevant, given that it contemplated a transaction where Western Reserve Title would act as an escrow agent. MLJ Group concedes in its brief, "Western Reserve specifically stated that MLJ Group would not be entitled to tax proration and MLJ Group

would likewise bear sole responsibility for fees that were originally to be divided between MLJ Group and QDP[,]" including the insurance payment and binder. (1/23/2025 Appellant's Brief, p. 18).

**{¶39}** Based on the facts presented in this case, the trial court did not err in finding:

As a matter of Ohio law, when Western Reserve Title was no longer handling the closing of the Properties, it was no longer under any independent duty to disburse funds for title insurance that were set forth in the settlement statements. *Johnson v. U.S. Title Agency, Inc.,* 2017-Ohio-2852, 91 N.E.3d 76, ¶ 45 (8th Dist.); *Eller Media Co. v. DGE, Ltd.,* 8th Dist. Cuyahoga Nos. 83273, 83286, 2004-Ohio-4748, ¶ 45-46.

(8/21/2024 Judgment Entry, p. 2).

**{¶40}** Accordingly, the trial court did not err in concluding that MLJ Group's breach of contract claims failed because Western Reserve Title had no contractual duty to procure title insurance since MLJ Group unilaterally elected to proceed with a cash only closing and not use Western Reserve Title's escrow service in finalizing the sale of the Properties. The court did not err in granting summary judgment in favor of Western Reserve Title.

**{¶41}** MLJ Group's first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE REGARDLESS OF WHETHER THERE WAS A VALID ORAL CONTRACT BETWEEN THE PARTIES, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER WESTERN RESERVE BREACHED ANY INDEPENDENT DUTIES OWED TO MLJ GROUP NOT TO NEGLIGENTLY OR FRAUDULENTLY MISLEAD MLJ GROUP INTO BELIEVING THAT IT WOULD SECURE TITLE INSURANCE POLICIES FOR MLJ GROUP'S TWO PROPERTIES.**

**{¶42}** In its second assignment of error, MLJ Group alleges the trial court erred in granting summary judgment in favor of Western Reserve Title because there is a genuine issue of material fact as to whether Western Reserve Title breached any independent duties owed to MLJ Group not to negligently or fraudulently mislead MLJ Group into believing it would secure title insurance policies for the Properties.

> The elements of negligent misrepresentation are (1) one who, in the course of his or her business, profession, or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; and (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837-838.

> A negligent misrepresentation claim does not lie for omissions: there must be an affirmative false statement. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261, 1269; *Zuber v. Ohio Dept. of Ins.* (1986), 34 Ohio App.3d 42, 45-46, 516 N.E.2d 244, 246-248.

> *Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 103-04, 742 N.E.2d 1198 (10th Dist.2000).

*Crockett Homes, Inc. v. Tracy*, 2024-Ohio-1464, ¶ 200 (7th Dist.).

> The elements of fraudulent misrepresentation are: "(1) a material false misrepresentation; (2) knowingly made; (3) with intent of misleading another into relying on it; (4) reasonable reliance on the misrepresentation; and (5) injury resulting from the reliance." *Isaac v. Alabanza Corp.*, 7th Dist. Jefferson No. 05 JE 55, 2007-Ohio-1396, 2007 WL 901596, ¶ 21, citing *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

Case No. 24 MA 0087

*Templeton v. Winner Enters., Ltd.*, 2024-Ohio-2745, ¶ 44 (7th Dist.).

The economic-loss doctrine generally prevents recovery in tort damages of purely economic loss. *Chemtrol Adhesives, Inc. v. American Manufacturers Mut. Ins. Co.*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989).

"'[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'" This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain free to govern their own affairs." 'Tort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.'"

(Internal citations omitted.). *Id.* at ¶ 6.

The economic loss doctrine applies to tort claims and presupposes that a tort cause of action exists. The economic loss doctrine is not a means to create an independent tort when there was not one.

The Eighth Appellate District essentially reached that same conclusion in *Stancik* [*v. Deutsche Natl. Bank*,] 2015-Ohio-2517 at ¶ 39-41 [(8th Dist.)]. In *Stancik*, the Trust moved for summary judgment claiming the negligence claims were barred by the economic loss doctrine. *Id.* at ¶ 39. The appellate court stated the economic loss doctrine would not bar a viable negligence claim because there was an allegation of physical injury. *Id.* However, it found the negligence claim was not viable because "the existence of contract action excludes the opportunity to present the same case as a tort claim." *Id.* quoting *Textron* [*Fin. Corp. v. Nationwide Mut. Ins.*

*Co.*], 115 Ohio App.3d [137] at 151 . . . [(9th Dist. 1996)]. "When an alleged breach is of a duty that is created by a contract and is 'independent of any duty imposed by law, the cause of action is one of contract, not tort.'" *Stancik,* quoting *Cuthbert* [*v. Trucklease Corp.*], 2004-Ohio-4417 at ¶ 44 [(10th Dist.)]. In *Stancik*, the parties' relationship was contractual, and any purported duties and responsibilities of the Trust in maintaining accurate records before initiating foreclosure are related to the contract. *Stancik* at ¶ 41. "Because Stancik's allegations regarding the Trust's alleged breach of its duties do not encompass any duties independent of their contractual relationship, his negligence claims necessarily fail as a matter of law." *Id.*

*Netherlands Ins. Co. v. BSHM Architects, Inc.*, 2018-Ohio-3736, ¶ 35-37 (7th Dist.).

**{¶43}** The foregoing reasoning equally applies here. In this case, Western Reserve Title did not commit negligent or fraudulent (as argued and addressed below) misrepresentations. There was an agreement between the parties in which Western Reserve Title would perform a title exam and assist in closing the property sale between MLJ Group and QDP. This agreement was subject to contract law which was later altered when MLJ Group unilaterally elected to proceed with a cash only closing. Nevertheless, MLJ Group asserted claims for negligence involving the same transactions and duties as the parties' contract when no independent duty to properly conduct a title search exists at common law. Because the parties' obligations were governed by contract, instead of any common law duty, any subsequent negligence claims related to Western Reserve Title's work are barred by the economic loss doctrine. *Id.* at ¶ 35-37.

**{¶44}** Again, MLJ Group decided to proceed with a cash only closing on its own. Thus, Western Reserve Title did not procure title insurance or undertake any other actions related to the closing except for recording the deeds as previously agreed upon. Western Reserve Title did not misrepresent that it would purchase title insurance on MLJ Group's behalf. When MLJ Group advised Western Reserve Title that it would proceed with a cash only closing, Western Reserve Title had no further duty or obligation to MLJ Group. Western Reserve Title advised MLJ Group that it would record the deeds but that MLJ Group was otherwise responsible for all fees associated with the closing. These fees

included the payment of the insurance premium and binder, i.e., payments which would have otherwise come from the escrow funds. This is further confirmed by the invoices Western Reserve Title submitted, which contain no references to title insurance.

**{¶45}** The record reveals Western Reserve Title's sole obligation was a contractual one. At no point did Western Reserve Title misrepresent that it would obtain or had obtained title insurance on MLJ Group's behalf. Accordingly, the trial court did not err in concluding that MLJ Group's negligence claim is barred by the economic loss doctrine.

**{¶46}** MLJ Group's second assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE THE OHIO RULES OF CIVIL PROCEDURE PERMIT PLEADING IN THE ALTERNATIVE AND, TO THE EXTENT THAT THERE IS NO ENFORCEABLE ORAL CONTRACT, THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER WESTERN RESERVE IS LIABLE UNDER THEORIES OF PROFESSIONAL NEGLIGENCE, PROMISSORY ESTOPPEL, AND FRAUD.**

**{¶47}** In its third assignment of error, MLJ Group argues the trial court erred in granting summary judgment in favor of Western Reserve Title because Civ.R. 8(E)(2) permits pleading in the alternative and, to the extent there is no enforceable contract, there is a genuine issue of material fact as to whether Western Reserve Title is liable under negligence (as argued and addressed above), promissory estoppel, and fraud.

**{¶48}** Regarding Civ.R. 8(E)(2) and promissory estoppel, MLJ Group stresses that "even if an enforceable contract did not exist, MLJ Group should still be entitled to recover pursuant to its claims for promissory estoppel. Civ.R. 8(E)(2)." (3/21/2025 Appellant's Reply Brief, p. 8); *see J & B Fleet Indus. Supply, Inc. v. Miller*, 2011-Ohio-3165, ¶ 68 (7th Dist.) (Alternative pleading is permitted under Civ.R. 8(E)(2)).

**{¶49}** "Promissory estoppel is not a contractual theory, but a quasi-contractual or equitable doctrine designed to prevent the harm resulting to the promisee from the

reasonable and detrimental reliance on a promise made by the promisor." *Pitt v. Quanta Bldg. Grp.*, 2024-Ohio-2297, ¶ 10 (9th Dist.), citing *Karnes v. Doctors Hosp.*, 51 Ohio St.3d 139, 142 (1990).

> In order to successfully assert a promissory estoppel claim, the following elements must be proven: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) the reliance caused an injury to the party claiming estoppel." *Extreme Machine & Fabricating, Inc. v. Avery Dennison Corp.*, 2016-Ohio-1058, 49 N.E.3d 324, ¶ 36; (7th Dist.), citing *Trehar v. Brightway Ctr.*, 7th Dist. No. 14 JE 20, 2015-Ohio-4144, ¶ 17; *Landpor Contractors, Inc. v. C & D Disposal Tech. L.L.C.*, 7th Dist. No. 11-JE-28, 2013-Ohio-1436, ¶ 34.

*B.T. Env't Sols., L.L.C. v. B.T. Energy Grp., Inc.*, 2018-Ohio-5113, ¶ 20 (7th Dist.).

> Promissory estoppel is "inconsistent with the existence of an express written contract." *Warren v. Trotwood-Madison School Dist. Bd. of Edn.*, 1999 WL 148233, *8 (2d Dist. Mar. 19, 1999). "'Thus, the existence of an enforceable express contract between the parties bars recovery under a promissory estoppel claim.'" *12100 Buckeye Ltd. v. Council for Econ. Opportunities in Greater Cleveland*, 2021-Ohio-4517, 2021 WL 6068835, ¶ 29 (8th Dist.), quoting *Americana Invest. Co. v. Natl. Contr. & Fixturing, L.L.C.*, 2016-Ohio-7067, 2016 WL 5627714, ¶ 13 (10th Dist.)[.]

*Gurary v. John Carroll Univ.*, 2024-Ohio-3114, ¶ 42 (8th Dist.).

**{¶50}** In the case at bar, the agreement between the parties is contractual in nature and precludes any claim for promissory estoppel. *Id.* at ¶ 42. There is also no evidence that Western Reserve Title made any affirmative promise to MLJ Group that it would obtain title insurance after MLJ Group unilaterally elected to go forward with a cash only closing. There is no dispute that MLJ Group contacted Western Reserve Title through its agent and asked that it perform certain work on its behalf. The initial Settlement Statements included title search services, recording services, and escrow

services. The invoices Western Reserve Title subsequently issued reflected the services which were actually performed, including those related to the title search and later recording of the deeds. This fact is further supported by the email exchange between Matos and McNamee. McNamee advised Matos that aside from recording the deeds, she would be performing no further actions on MLJ Group's behalf and would be issuing invoices summarizing those services which had been performed.

**{¶51}** Western Reserve Title had no further duty or obligation to perform escrow services, including obtaining title insurance. Western Reserve Title via McNamee advised MLJ Group that it would send invoices for its title search services and that it would proceed with recording the deeds. No mention of title insurance was made. Thereafter, Western Reserve Title presented MLJ Group with invoices totaling all of its services related to the sale of the Properties. The invoices did not include title insurance services. Western Reserve Title is not liable for MLJ Group's negligence in failing to properly review the invoices.

**{¶52}** Accordingly, the trial court did not err in concluding that MLJ Group's claim for promissory estoppel was improper because the parties' obligations were governed by a valid and enforceable contract, which was unilaterally canceled by MLJ Group.

**{¶53}** MLJ Group also asserts Western Reserve Title engaged in fraud.

> In order to prevail on a claim of fraud, a plaintiff must demonstrate all of the elements:
>
> (a) a representation or, where there is a duty to disclose, concealment of a fact,
>
> (b) which is material to the transaction at hand,
>
> (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
>
> (d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the misrepresentation or concealment, and

(f) a resulting injury proximately caused by the reliance.

*KSMAC Holdings, Ltd. v. Ice Zone Realty, Ltd.*, 2022-Ohio-1456, ¶ 51 (7th Dist.), citing *Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169 (1984).

**{¶54}** Summary judgment is appropriate on a fraud claim based on the economic loss doctrine where the claim is based on a breach of contract. *KSMAC Holdings, Ltd.* at ¶ 59.

**{¶55}** The record before us does not establish that Western Reserve Title misrepresented or concealed any material facts related to the transaction at hand. The parties' obligations ultimately arose from a contractual agreement, which was unilaterally canceled via email by MLJ Group and no further agreements existed between the parties. Thus, the economic loss doctrine bars any fraud claim based upon the same facts or omissions.

**{¶56}** Western Reserve Title did not represent or conceal the fact that it did not purchase title insurance. The Settlement Statements that Western Reserve Title prepared when it was going to handle the closing provided for the purchase of title insurance to be disbursed from the funds. However, MLJ Group chose to proceed with a cash only closing on its own. As a result, MLJ Group became responsible for all closing fees, including the insurance payment and binder. The invoices Western Reserve Title prepared were limited to its preparation of the title commitment and recordation of the deeds. The invoices did not provide for title insurance. As a consequence, there was no justifiable reliance by MLJ Group. Western Reserve Title is not liable for MLJ Group's negligence in failing to properly review the invoices. Again, if MLJ Group had any confusion or questions involving either the email exchange between Matos and McNamee or the invoices sent by Western Reserve Title, "[a] duty [fell] upon the purchaser [MLJ Group] to make inquiry and examination." *Layman,* 35 Ohio St.3d at 177. MLJ Group unilaterally canceled the parties' agreement for escrow services via email and no further agreements existed. However, MLJ Group did not ask any further questions about what

effect canceling the escrow services would have or what services, if any, Western Reserve Title would perform in light of the canceled contract. MLJ Group made no inquiry after receiving the invoices about any line items or what certain costs were for or why certain things were billed or not billed. MLJ Group even admitted to paying the invoices without looking at them despite its duty to examine under *Layman*. *See Id.* Western Reserve Title was not obligated to purchase title insurance based on the facts presented in this case.

**{¶57}** Accordingly, the trial court did not err in concluding that MLJ Group's fraud claim failed as a matter of law because MLJ Group did not establish the essential elements of its claim. *See KSMAC Holdings, Ltd.*, 2022-Ohio-1456, at ¶ 51 (7th Dist.). In addition, MLJ Group's fraud claim is also barred by the economic loss doctrine due to the presence of a valid and enforceable contract.

**{¶58}** MLJ Group's third assignment of error is without merit.

## CONCLUSION

**{¶59}** For the foregoing reasons, MLJ Group's assignments of error are not well-taken. The August 21, 2024 judgment of the Mahoning County Court of Common Pleas granting summary judgment in favor of Western Reserve Title is affirmed.

Robb, P.J., concurs.

Hanni, J., dissents without dissenting opinion.

Case No. 24 MA 0087

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**