[Cite as *Peiffer Wolf Carr Kane Conway & Wise, APLC v. Washington*, 2025-Ohio-4839.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

PEIFFER WOLF CARR KANE
CONWAY & WISE, APLC,             :

    Plaintiff-Appellee,            :

                               No. 114319

    v.                             :

HERBERT WASHINGTON, ET AL.,      :

    Defendants-Appellants.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN
                PART,  AND REMANDED
**RELEASED AND JOURNALIZED:**  October 23, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-965514

---

### *Appearances:*

Flowers & Grube, Paul W. Flowers, and Kendra N. Davitt;
Haber LLP, Richard C. Haber, Lindsey K. Self, and Natalie
D. Davis, *for appellee*.

Warren Terzian LLP and Thomas D. Warren; McDonald
Hopkins LLC and Sanford E. Watson, *for appellants*.

WILLIAM A. KLATT, J.:

{¶ 1} Defendants-appellants Herbert Washington ("Washington"), HLW

Fast Track, Inc., HLW Fast Track PA, LLC, and Air Arch, Inc. ("corporate

defendants" or, collectively with Washington, "defendants") appeal following a jury verdict and argue (1) the trial court erred when it granted a directed verdict in favor of plaintiff-appellee Peiffer Wolf Carr Kane Conway & Wise, APLC ("Peiffer Wolf") finding the corporate defendants liable under quantum meruit and (2) the jury's quantum meruit awards were against the manifest weight of the evidence. For the following reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. Factual and Procedural History

## A. Underlying Lawsuit

{¶ 2} This lawsuit arises from a dispute over the attorney fees owed by defendants to Peiffer Wolf for its representation of defendants in an underlying discrimination lawsuit against McDonald's.

{¶ 3} Washington — a sophisticated businessman who at one time owned 27 McDonald's franchises and was a former chairman of the Buffalo, New York Federal Reserve — retained the law firm of Peiffer Wolf to pursue a racial discrimination lawsuit against McDonald's; Washington is Black. Washington's purpose for the lawsuit was twofold: to allege discrimination and to maximize his leverage in negotiating the sale of his 14 McDonald's restaurants ("franchises") to McDonald's.[1] The valuation and potential sale of Washington's franchises influenced the terms of Peiffer Wolf's contingency fee agreement with Washington.

---

[1] Washington originally purchased the McDonald's franchises in his name and later assigned the franchises to one or all of the corporate defendants.

**{¶ 4}** Peiffer Wolf and Washington agreed the contingency fee would be based only on funds received in settlement of the discrimination claim and the contingency fee would not apply to any monies received for the sale of Washington's franchises. To implement that term in the contingency agreement, the parties agreed to deduct the franchises' fair market value from the settlement amount before calculating the contingency fee. Therefore, determining the fair market value of the franchises was an important element of the contingency fee agreement. Because McDonald's is a "closed system" that "keeps tight hold on the valuation of franchises," Peiffer Wolf relied upon information provided by Washington and his associates to establish a formula to calculate the franchises' fair market value. Tr. 816.

**{¶ 5}** In December 2020, Peiffer Wolf and Washington — but not the corporate defendants — executed a contingency fee agreement ("December 2020 agreement"). The December 2020 agreement expressly identifies the parties as Peiffer Wolf and Washington. In addition, the signature line indicates that Washington signed the agreement in his individual capacity. The December 2020 agreement, which listed a contingency fee of 33 percent rather than Peiffer Wolf's typical 40 percent, reads, in part, as follows:

> Legal Fees
> 4. Generally: Client agrees to pay Lawyers the reasonable fee set forth below:
>
> 4.1 In the event that a recovery is made in this Matter, Lawyers will be paid for handling Client's case by a contingency fee of 33% of the Value Received.

4.2 "Value Received" is defined to include the gross amount of money recovered by Lawyers less any costs and expenses. The contingency fee percentage will be applied to the net recovery (i.e., after subtracting costs advanced from the gross recovery).

Value Received covers any and all money recovered by Lawyers — whether through arbitration, litigation, mediation, settlement, restitution, recovery ordered by the regulatory authorities or any governmental agencies, or any other method. If settlement or any other resolution of the litigation involves a termination or buyout of Client's interests and/or rights in his McDonald's franchise locations at the time of the settlement or other resolution, Value Received shall exclude the fair market value of the Client's McDonald's franchise locations at the time of the settlement or other resolution as agreed by the parties or (absent agreement) determined by multiplying the pre-debt cashflow from the trailing twelve months of operations at the time of the settlement or other resolution by seven (e.g., a location with a trailing twelve months predebt cashflow of $200,000 would be valued at $1,400,000 [7 x $200,000]).

Plaintiff's exhibit No. 23. The fair market calculation included in the December 2020 agreement — multiplying the pre-debt cashflow from the trailing 12 months of operations at the time of the settlement by seven — was represented by Washington and his associates as the standard formula to value a McDonald's franchise ("2020 fair market value formula"). Because Peiffer Wolf received its contingency fee only on a recovery that exceeded the fair market value of the franchises, a higher fair market valuation would result in a lower contingency fee.

{¶ 6} On February 16, 2021, Peiffer Wolf filed a racial discrimination complaint in federal court on behalf of Washington against McDonald's.

{¶ 7} At the first mediation on April 16, 2021, McDonald's offered Washington $21,710,000 for his franchises, plus $2,000,000 to resolve the racial discrimination lawsuit. Washington rejected the offer and discovery continued.

{¶ 8} As Peiffer Wolf worked with the defendants to respond to McDonald's discovery requests, it allegedly learned that the defendants had engaged in certain business practices that it feared would be detrimental to defendant's discrimination claims and to defendant's rights under the franchise agreements with McDonald's. Washington disagreed with Peiffer Wolf's assessment of these business practices and their impact on his claims. Peiffer Wolf further discovered that the franchises were not owned by Washington individually, but by the corporate defendants. Therefore, on May 26, 2021, Peiffer Wolf filed an amended complaint adding the corporate defendants as plaintiffs in the federal discrimination suit. Lastly, Peiffer Wolf learned that the standard multiplier represented in the 2020 fair market value formula was not seven, as represented by Washington and incorporated into the December 2020 contingency fee agreement, but likely between four and five.

{¶ 9} On September 8, 2021, the federal district court granted Washington and the corporate defendants access to 40 years of documents related to McDonald's treatment of Black employees and operators. To take advantage of the positive ruling in the defendants' favor and avoid revealing the defendants' business practices that arguably could have negatively impacted the pending lawsuit, Peiffer Wolf requested and McDonald's agreed to stay discovery and participate in a second mediation on September 17, 2021.

{¶ 10} Prior to the second mediation, Kevin Conway ("Conway"), the managing partner of Peiffer Wolf, proposed using $23,710,000 as the fair market value of the franchises rather than using the formula set forth in the December 2020 agreement. He also proposed calculating the contingency fee based on 10 percent of the gross recovery as a second option. Conway and Wasington presented conflicting testimony as to whether they agreed to modify the December 2020 agreement prior to the second mediation.

## B. Second Mediation

{¶ 11} On September 17, 2021, the parties participated in a 17-hour mediation. According to Conway, the mediator clearly communicated that any offer above $23,700,000 was in resolution of the defendants' racial discrimination lawsuit.[2] Conway stated that during the mediation, Washington asked Conway to calculate attorney fees under the two calculations proposed by Conway and, when Washington and Joe Peiffer ("Peiffer") — a founding attorney of the firm — were alone, Washington requested the same information from Peiffer. Conway testified that he and Peiffer, separately, presented Washington with the same calculations that showed a contingency fee of 33 percent on the portion of the settlement greater than $23,710,000 was the more advantageous fee option for the defendants. Conway denied that Washington ever asked him during the second mediation to

---

[2] The mediator's suggested fair market value for the franchises — $23,700,000 — varied slightly from Conway's proposal to Washington of $23,710,000.

calculate attorney fees pursuant to the terms of the December 2020 agreement utilizing the 2020 fair market value formula and seven as a multiplier.

## C. Settlement

{¶ 12} On September 21, 2021, the parties reached a settlement in the amount of $33,500,000. Less than 20 minutes after Washington executed the settlement documents, Tom Micco — Washington's controller — emailed a letter from Washington to Conway in regard to the December 2020 agreement, the 2020 fair market value formula, and Peiffer Wolf's new contingency fee proposal. Specifically, the letter reads, in pertinent part:

> After considerable thought, my position is that I want to enforce the current signed agreement [(the December 2020 agreement)]. That being said I would be open to consider something outside of the current agreement once the lawsuit is settled. At that time, I will have my counsel work with you to resolve any concerns you may have.

Plaintiff's exhibit No. 44. In other words, Washington's letter stated his preference to use the 2020 fair market value formula and related contingency fee calculation listed in the December 2020 agreement. Under the December 2020 agreement, applying the 2020 fair market value formula with a multiplier of seven, the contingency fees totaled approximately $400,000. If the parties had applied the terms of Peiffer Wolf's recent contingency fee proposal that resulted in the lesser fee — a fair market value of the franchises at $23,710,000 and a contingency fee of 33 percent applied to the difference between $33,500,000 (the full settlement) and $23,710,000 (the agreed-upon fair market value of the franchises) — the contingency fee would have totaled $3,230,700. Despite the dispute over what

contingency fee was due, Peiffer Wolf continued with its representation of the defendants.

{¶ 13} On October 11, 2021, Conway sent, via email, a settlement statement to Washington. The settlement statement reads, in pertinent part:

| | |
|---|---|
| SETTLEMENT SUM RECEIVED INTO IOLTA | $ 33,500,000.00 |
|      Less litigation expenses . . . | $ 21,543.32 |
|      Adjusted settlement | $ 33,478,456.68 |
|      Less attorneys' fees* | $ 11,047,890.70 |
|      Discount applied** | $ 7,817,190.70 |
|      Total attorneys' fees to be collected | $ 3,230,700.00 |
| | |
| NET TO CLIENTS | $ 30,247,756.70 |

\*. . . .

\*\* Per December 15, 2020 engagement agreement, attorneys' fees calculated at 33% of the "value received." This calculation reflects Clients' material breaches of the Franchise Agreements discovered during collection of production response (undisclosed diversion of complaints to third-party vendor not approved by McDonald's, unauthorized use of McDonald's trademarks by unauthorized vendor, and misrepresentation to Rewrite Committee regarding customer-recovery procedures), which gave McDonald's the right to terminate the franchises and reduced the actual value of the stores to zero.

\*\*\* Attorneys' fees discounted as discussed to reflect fee for attorneys' services in light of unanticipated decrease in value of stores due to material breach.

Defendants' exhibit B. The record reflects no evidence that McDonald's ever became aware that the defendants may have violated the terms of the franchise agreements, thereby potentially reducing the value of the franchises to zero, as Peiffer Wolf contends in the settlement statement.

{¶ 14} Peiffer Wolf finalized the settlement on December 16, 2021, when McDonald's issued payment to Washington's company, HLW Fast Track, Inc. The defendants had not paid any attorney fees to Peiffer Wolf at that time. As part of the settlement with McDonald's, and at Peiffer Wolf's request, Washington placed $3,230,700 in escrow, pending resolution of Peiffer Wolf's disputed attorney fees.

**D. Peiffer Wolf's Lawsuit**

{¶ 15} On June 29, 2022, Peiffer Wolf filed the underlying complaint against Washington and the corporate defendants seeking unpaid attorney fees under three causes of action: quantum meruit, fraud, and alternatively, breach of contract. Peiffer Wolf's fraud and alternative breach-of-contract claims were based solely on the December 2020 agreement. The defendants filed an answer on August 29, 2022. Peiffer Wolf filed an amended complaint on August 30, 2022, and the defendants filed an answer on September 16, 2022. Discovery was conducted, and Peiffer Wolf retained attorney Richard S. Koblentz ("Koblentz") as an expert witness.

**1. Plaintiff's Expert Report**

{¶ 16} Prior to trial, Koblentz provided a detailed 26-page expert report in which Koblentz reserved the right to revise his opinion upon the receipt of additional evidence or testimony. Koblentz rendered the report, at Peiffer Wolf's request, to opine on the amount of attorney fees, if any, the firm earned through its representation of Washington and the corporate defendants. The report specifically stated that the December 2020 agreement was between Peiffer Wolf and Washington, individually, but because Washington owned and operated his

franchises through the corporate defendants, Peiffer Wolf represented all of the defendants in the discrimination lawsuit.

{¶ 17} Koblentz's report acknowledged the terms of the December 2020 agreement and Peiffer Wolf's later proposal to use $23,710,000 as the fair market value of the franchises.

{¶ 18} According to the report, the case proceeded to mediation on September 17, 2021, where "the mediator made it clear to Mr. Washington and Peiffer Wolf that any amount that would be paid by McDonald's over $23,710,000 was added value to resolve the litigation and not value rendered for the restaurants." Koblentz report, p. 14. Koblentz's report reflected an agreed settlement on September 21, 2021, in the amount of $33,500,000.

{¶ 19} In his report, Koblentz stated that if fraud induced Peiffer Wolf to execute the December 2020 agreement, the agreement was not valid and Peiffer Wolf could recover attorney fees pursuant to quantum meruit. The alleged fraud was the defendants' representation that seven was the standard multiplier applied in the formula to determine the franchises' fair market value when Washington had never previously sold a franchise using such a high multiplier. Koblentz's report included these statements about determining the reasonable value of attorney fees under the theory of quantum meruit:

> In determining the reasonable value of a discharged attorney's legal services rendered pursuant to a contingency fee agreement, the totality of the circumstances surrounding the situation are to be considered, including:

> "[t]he number of hours worked by the attorney before the discharge[,] . . . the recovery sought, the skill demanded, the results obtained, and the attorney-client relationship itself." *Oliver*, 2023-Ohio-275 at ¶ 63 citing *Pipino v. Norman*, 7th Dist. Mahoning No. 16 MA 0153, 2017-Ohio-9048, p. 30, quoting *Reid*, at 576-577. Courts may also consider the factors for determining the reasonableness of fees used by the rules governing attorney conduct. *Id.* at 576-577, 629 N.E.2d 431. "Quantum meruit can be used whether there is an express contract for fees (written or oral) or where there is no express contract for fees (i.e., there is an implied contract)." *Id.*
>
> Moreover, the attorney fee provided in a contingency fee agreement may be utilized as a guide for awarding attorney fees to a discharged contingent-fee attorney. *Oliver*, 2023-Ohio-275 at ¶ 68 citing *Law offices of Russell A. Kelm v. Selby*, 10th Dist. Franklin No. 15AP-1135, 2017-Ohio-8239, ¶ 30 (no abuse of discretion by trial court in valuing attorney fee award under quantum meruit on earlier contingency agreement). While a discharged contingent-fee attorney cannot recover attorney fees pursuant to the contingency fee agreement, courts may use that agreement to help value the legal services rendered by the attorney. As to determining attorney fees in such circumstances, the Court held in *Fox* that, ". . . the maximum reach of its right to fees, with regard to the client, is the reasonable value of the legal services actually rendered to the date of discharge." quoting [sic] *Fox & Associates Co. L.P.A. v. Purdon*, 44 Ohio St.3d at 72, 541 N.E.2d at 450.

Koblentz report, p. 20.

{¶ 20} Koblentz applied a 33 percent contingency fee and a range of factually and historically utilized multiples — 4.5, 4.69, and 5 rather than 7 — to calculate attorney fees under a quantum meruit theory of recovery; the calculations resulted in attorney fees in the range of $3,321,567 to $4,094,910. The proposed attorney fees did not charge a contingency fee on the fair market value of Washington's franchises.

{¶ 21} Koblentz's report also provided an opinion as to the amount of attorney fees due under a breach-of-contract theory. For recovery under breach of

contract, Koblentz's report assumed an oral modification of the December 2020 agreement occurred that adopted new terms including the corporate entities as parties to the agreement, an agreed-upon fair market value of the franchises at $23,710,000, and a 33 percent contingency fee. Applying those terms, Peiffer Wolf could recover reasonable attorney fees in the amount of $3,230,700 from the defendants under a breach of contract.

## 2. Koblentz's Trial Testimony

{¶ 22} Koblentz testified that at Peiffer Wolf's request, he assessed the amount of reasonable attorney fees, if any, earned by the law firm during their representation of Washington and the corporate defendants. Koblentz testified to ranges of reasonable attorney fees earned by Peiffer Wolf for providing legal services to Washington and the corporate defendants, depending upon whether the jury determined the law firm recovered legal fees under quantum meruit or breach of contract. In rendering his opinion, Koblentz did not provide an opinion on the fair market valuation of Washington's franchises or whether Peiffer Wolf was fraudulently induced to enter the December 2020 agreement.[3]

{¶ 23} According to Koblentz, if Washington fraudulently induced Peiffer Wolf to execute the December 2020 agreement, the agreement was not enforceable,

---

[3] Because the trial court ultimately granted a directed verdict on Peiffer Wolf's claim that it was entitled to a quantum meruit award from the corporate defendants (leaving the determination of the amount of the award to the jury), and because the jury did not reach Peiffer Wolf's alternative claim for breach of contract in respect to Washington (resulting in damages being calculated under quantum meruit), we need only address Koblentz's testimony as it relates to determining the value of Peiffer Wolf's representation under quantum meruit.

and absent an enforceable agreement, the attorney fees would be calculated under quantum meruit. Quantum meruit required calculation based on the value that lawyers would normally charge for the legal services. Koblentz also stated that in determining the value of the legal services under quantum meruit, it was appropriate to look at the agreed-upon terms in the December 2020 agreement to interpret the parties' intentions even though the contract was unenforceable. Per Koblentz, the parties agreed that if McDonald's purchased the franchises as part of the settlement, they would exclude from the contingency calculation the fair market value of the franchises. Koblentz also testified that Peiffer Wolf was "exceedingly fair" because it offered to set the contingency fee at 33 percent rather than the firm's standard 40 percent. Tr. 1347.

{¶ 24} As to the quantum meruit value of the attorney fees for legal services rendered to the corporate defendants, Koblentz initially testified as follows:

> PLAINTIFF'S COUNSEL: And so we know because you have testified and the jury has seen it that 19 minutes after agreeing to 33 and a half million dollars in settlement of this case, Mr. Washington sent a lawyer — a letter to these lawyers indicating that he didn't — that he wanted to go back and be bound by the original agreement that did not include the three corporate entities?
>
> KOBLENTZ: Right.
>
> PLAINTIFF'S COUNSEL: As a result of that decision by Mr. Washington, was there a written fee agreement with those three corporate entities?
>
> KOBLENTZ: There was not.
>
> PLAINTIFF'S COUNSEL: And if there was not a written fee agreement with those corporate entities, what would be the method for calculating

the quantum meruit for the — the quantum meruit for the lawyers' services in representing those entities and achieving the contingency of 33 and a half million that happened in this case?

KOBLENTZ: Normally in a discrimination case it would be 40 percent; however, here, the lawyers agreed to one-third, so I think that would be appropriate.

PLAINTIFF'S COUNSEL: Or 33 percent, not quite one-third?

KOBLENTZ: Okay, 33 percent.

PLAINTIFF'S COUNSEL: So under normal quantum meruit in light of the decision that Mr. Washington made to disavow putting his corporate entities on the contract, would that make it 33 percent of the gross recovery of 33 and a half million dollars?

KOBLENTZ: Yes, it would. Because I went to law school because there was no math, let me — if you folks would indulge me for a moment. Okay, ballpark that would be 12 million —

PLAINTIFF'S COUNSEL: Let me help you. I did the math over here. It's $11,055,000?

KOBLENTZ: Okay $11,055,000.

PLAINTIFF'S COUNSEL: 33 percent?

KOBLENTZ: It's nice to have a person do these things for you. Thank you.

PLAINTIFF'S COUNSEL: 33 percent of 33.5 million is just over $11 million?

KOBLENTZ: Correct.

PLAINTIFF'S COUNSEL: And so having chosen not to put his corporate entities on that agreement, he's potentially subjecting himself to fees of $11 million in this case?

KOBLENTZ: That would be the quantum meruit that we valued services provided to those— to those organizations and to him based upon the work the lawyers did, yes.

PLAINTIFF'S COUNSEL: But I asked you to look at it from a different perspective, didn't I?

KOBLENTZ: Yes, you did.

Tr. 1320-1322. Koblentz's opinion that Peiffer Wolf was entitled to attorney fees in the amount of $11,055,000 was not included in his report and was first introduced at trial.

{¶ 25} Koblentz then testified to the quantum meruit analysis detailed in his report. Koblentz testified that he calculated 33 percent contingency fees using three different multipliers — 4.5, 4.69, and 5 — that resulted in a range of attorney fees earned by Peiffer Wolf for the work they completed for Washington and the corporate defendants. Koblentz testified that the 33 percent contingency fees associated with the 4.69 and 5.0 multipliers were $3,767,372 and $3,250,491, respectively. In contrast, Koblentz's report listed the range of contingency fees for the three multipliers as $3,321,567, $3,801,039.99, and $4,094,910. No testimony explained the difference in ranges provided at trial versus those contained in Koblentz's report. Koblentz also testified about considering the Rules of Professional Responsibility when determining if an attorney fee is excessive.

{¶ 26} Later in his direct questioning, Koblentz again alluded to potential attorney fees in the amount of $11 million:

PLAINTIFF'S COUNSEL: And finally, the opinions rendered in this report pertain to the amount of reasonable attorney fees, if any, earned by Peiffer Wolf for their representation of Mr. Washington. So that is the focus of your expert report?

KOBLENTZ: Right. We put ["]if any["] in just to cover everything. That would be a standard line we put in a report. Again, we have no desire — and not only are we not allowed to, we have no desire to invade the province of this jury. It's all up to them to make this decision. They work from zero to over $11 million.

Tr. 1335. And on redirect, Koblentz agreed with counsel that "if Mr. Washington is to have his way, then his corporate entities owe $11,055,000." Tr. 1395. Lastly, Koblentz stated that McDonald's paid the $33,500,000 settlement to HLW Fast Track, who was not a party to the December 2020 agreement, and, therefore, the corporate defendants owed Peiffer Wolf $11,055,000 in attorney fees under quantum meruit:

PLAINTIFF'S COUNSEL: The money was paid to HLW Fast Track, correct?

KOBLENTZ: That is correct.

PLAINTIFF'S COUNSEL: Who, based upon Mr. Washington's disavowing of the agreement in September, wasn't a party to a fee agreement?

KOBLENTZ: That is correct also.

PLAINTIFF'S COUNSEL: And under Ohio law that means that HLW Fast Track owes the Peiffer Wolf firm under quantum meruit?

KOBLENTZ: Under quantum meruit calculation, that would be correct, sir.

PLAINTIFF'S COUNSEL: And under Ohio law, the quantum meruit is 33 percent, which is the fee agreement — the fee contingency percentage they were willing to charge, of the gross recovery, correct?

KOBLENTZ: That would be the standard quantum meruit calculation that would be utilized in the legal industry relative to matters like this.

PLAINTIFF'S COUNSEL: And so if Mr. Washington is to have his way, then his corporate entities owe $11,055,000?

KOBLENTZ: That would also be correct.

Tr. 1394-1395.

{¶ 27} In addition to his trial testimony, Koblentz's expert report was introduced as an exhibit.

## 3. Motions for Directed Verdict

{¶ 28} At the close of Peiffer Wolf's case, the defendants moved for a directed verdict that the trial court denied. And at the close of the defendants' case, Peiffer Wolf moved for a directed verdict on the issue of quantum meruit against the three corporate defendants. Peiffer Wolf sought a directed verdict on liability only, arguing that the unrebutted testimony demonstrated there was no signed fee agreement between the corporate defendants and Peiffer Wolf. Counsel for Peiffer Wolf stated that

> Mr. Washington disavowed the effort to amend and add them to the fee agreement. As a result, Ohio law is clear that where there is an active representation by the law firm under the terms, under a belief that they are doing so on a contingency fee basis and where the client permits the representation and allows it to conclude, in this case with a 33 and a half million dollars settlement, Peiffer Wolf is entitled to quantum meruit from these three entities.
>
> Moreover, the entire settlement proceeds was paid to the corporate entity, HLW Fast Track, and as a result the jury should be instructed that they are simply to determine the amount of quantum meruit as to HLW Fast Track, HLW Fast Track PA, and Air Arch, but there is no determination that they need to make at this time as to liability for quantum meruit.

Tr. 1942.

{¶ 29} Defense counsel opposed Peiffer Wolf's motion for directed verdict and argued Washington did not object to adding the corporate defendants to the case, but questions of fact remained as to the agreed-upon contingency fee and whether Washington, rather than the corporate defendants, was responsible for any potential attorney fees. During discussions with the trial judge, defense counsel conceded the corporate defendants and Peiffer Wolf never executed a fee agreement:

> COURT: Thank you. [Counselor], would you agree that there is no or hasn't been any testimony that there was, in fact, a fee agreement with those other entities that have been discussed so extensively both today and yesterday?
>
> DEFENSE COUNSEL: Yes. And part and parcel to that, with those fee agreements there is also no agreement as to what they would be entitled to or what those entities would have to pay. So I am not sure how you could have a directed verdict saying that they're entitled to a certain amount when — . . . .

Tr. 1944-1945.

{¶ 30} The trial court granted Peiffer Wolf's motion for directed verdict, over defense counsel's objections. Defense counsel then moved for a directed verdict on the issue of fraud, and the trial court denied the motion.

## 4. Jury Instructions

{¶ 31} Following closing statements, the trial judge charged the jury on various issues, including damages for fraud and quantum meruit:

> Jury instruction number 14. Damages for fraud. If you find for the plaintiffs, you will decide from the greater weight of the evidence what amount of money will reasonably compensate them for the actual damage directly caused by the fraud.

Jury instruction number 15. Quantum meruit. Plaintiff may recover the reasonable value of the work provided to defendants if you find by the greater weight of the evidence that, one, valuable services were rendered; two, for the person sought to be charged; three, which services were accepted by the person sought to be charged, used, and enjoyed by him; four, under such circumstances as reasonably notified the person sought to be charged, that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

If you find that defendant, Herbert Washington, is liable to plaintiff for fraud, you will determine the amount of damages in quantum meruit to award, if any. If you do not find that defendant, Herbert Washington, is liable to plaintiff for fraud, you will not award damages in quantum meruit in respect to defendant, Herbert Washington.

Regardless, the Court instructs you that the Court has found as a matter of law that HLW Fast Track, Inc., HLW Fast Track PA, LLC, and Air Arch, Inc. are liable for quantum meruit to plaintiff in an amount for you to determine. As such, you need only determine the amount of damages in quantum meruit to award, if any.

The total award of quantum meruit, whether applied to the liability of defendant Washington and the corporate entities or just the corporate entities, the total award amount should equal the amount you determine to be the reasonable value of the work provided to the defendants and no more.

Tr. 2030-2031. The trial court also provided the jurors with interrogatories and verdict forms.

## 5. Jury Verdict

{¶ 32} The jury found in favor of Peiffer Wolf on its fraud claim, thereby invalidating the December 2020 agreement. The jury returned a verdict finding, as a matter of law, in favor of Peiffer Wolf and against the corporate defendants in the amount of $6,500,000 on Peiffer Wolf's claim for quantum meruit. The jury found in favor of Peiffer Wolf and against Washington in the amount of $2,000,000, on

the quantum meruit claim. No verdict was rendered on the alternative claim of breach of contract.

{¶ 33} The jury interrogatory answers demonstrated the jury found, by a preponderance of the evidence, that (1) the defendants made false representations of fact to Peiffer Wolf regarding the fair market value of Washington's franchises that was included in the December 2020 agreement, (2) the representations were material to the December 2020 agreement, (3) the representations were false or made with utter disregard and recklessness as to the truth or falsity of the fact, (4) Peiffer Wolf relied upon the facts presented by the defendants, and (5) an award would compensate Peiffer Wolf for the reasonable value of their services in quantum meruit. In other words, the jury found the defendants' statements about the formula used to calculate the fair market value of the franchises and the application of a multiplier of seven fraudulently induced Peiffer Wolf to agree to the December 2020 agreement, Peiffer Wolf was damaged when it relied upon those representations, and the damages under quantum meruit totaled $8,500,000.

## 6. Punitive Damages Phase of Trial

{¶ 34} The trial court then advised the jury that they would proceed to the second phase of the trial to address punitive damages. Upon receiving this information, comments by jury members indicated confusion as to whether the initial verdict addressed punitive damages:

> JUROR NO. 4: Will there be clarification about why this is happening instead of just settling?

JUROR NO. 5: We thought we were done.

THE COURT: There is a second phase as to punitive damages.

JUROR NO. 5: We thought we ruled on that.

THE COURT: Not as to punitive damages, no.

JUROR NO. 1: So we were under the impression that was the way that was broken up.

THE COURT: The Court has what's called bifurcated the punitive damages phase. We can explain that to you after the lunch break, what that means. Again, it's not a whole new trial. Please don't think for a minute that's what it is. It's not. You all have heard all of the evidence on this case already for two weeks. . . .

Tr. 2064-2065.

{¶ 35} During the punitive-damages phase, Peiffer Wolf sought an award of $24,462.27, plus Peiffer Wolf's attorney fees incurred for prosecuting the lawsuit against the defendants. The jury was provided with jury instructions, interrogatories, and general verdict forms.

{¶ 36} All jurors found, by clear and convincing evidence, that Washington's actions demonstrated actual malice, aggravated fraud, or egregious fraud and punitive damages should be assessed against Washington. The jury assessed Washington $1 in punitive damages, and the jury found Washington was not liable for Peiffer Wolf's attorney fees.

{¶ 37} The trial court issued a May 14, 2024 judgment entry and a May 20, 2024 nunc pro tunc entry to reflect the jury's verdict. On June 17, 2024, the trial court granted Peiffer Wolf's motion for prejudgment and postjudgment interest and

issued a corresponding nunc pro tunc judgment entry.  On the same date, the trial court granted the defendants' motion to stay execution of the judgment.

**7. Appeal**

{¶ 38} The defendants filed a timely notice of appeal on August 30, 2024, presenting two assignments of error:

> Assignment of Error I:  The trial court erred in granting a directed verdict on liability in quantum meruit against the three corporate defendants.

> Assignment of Error II:  The jury's quantum meruit awards are against the manifest weight of the evidence.

The defendants filed a motion to unseal the jury instructions, and this court granted that motion on December 6, 2024.  On December 16, 2024, the defendants filed a motion to dismiss the appeal, arguing the jury verdict and related judgment entry did not resolve Count 3, breach of contract, and, therefore, the case lacked a final appealable order.  After the parties fully briefed the issue, this court granted the motion to dismiss on January 9, 2025.  Following this court's dismissal order, the parties filed on January 23, 2025, a joint motion to amend the trial court's June 17, 2024 nunc pro tunc judgment entry.  The trial court granted the joint motion on January 27, 2025, and issued a final appealable order on the same date that incorporated this language:  "[Peiffer Wolf's] alternative claim of breach of contract is dismissed with prejudice based upon the jury's verdict."  On February 11, 2025, the defendants filed a motion to reinstate the appeal that this court granted and,

simultaneously, vacated its January 9, 2025 dismissal entry.  The parties submitted briefs and presented oral arguments, and the case is properly before this court.

## II. Legal Analysis

### A. Directed Verdict

{¶ 39} In their first assignment of error, the defendants argue that the trial court erred when it granted a directed verdict finding the corporate defendants liable under quantum meruit because there was a factual dispute over whether the parties agreed to modify the December 2020 agreement to add the corporate defendants to the fee agreement.  They also allege there was a factual dispute as to whether the parties agreed to a different valuation for the franchises.  The defendants further argue that because there was an issue of fact regarding the existence of a modified agreement, a jury might have found the defendants liable for breach of the modified contract, thereby excluding recovery under quantum meruit.  According to the defendants, the amount of the contingency fee owed by the corporate defendants would have been less under Peiffer Wolf's breach-of-contract claim than under its quantum meruit claim.

{¶ 40} Under Civ.R. 50(A)(4), a court may properly grant a motion for directed verdict when, after construing the evidence most strongly in favor of the party against whom the motion is directed, it finds that reasonable minds could come to but one conclusion on a determinative issue, and the conclusion is adverse to the nonmoving party.  A motion for directed verdict under Civ.R. 50 tests the sufficiency of the evidence, not the weight of the evidence or the credibility of

witnesses. *Wagner v. Roche Laboratories*, 1996-Ohio-85, ¶ 17-18. Because a motion for directed verdict tests the legal sufficiency of the evidence, we review the lower court's decision de novo, with no deference to the court's decision. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 2002-Ohio-2842, ¶ 4.

{¶ 41} "Faced with the question of sufficiency through a directed verdict motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 25. The reasonable-minds test requires the court to determine whether there is any evidence of substantive probative value that favors the nonmoving party. *Rieger v. Giant Eagle, Inc.,* 2019-Ohio-3745, ¶ 9. When deciding a motion for a directed verdict the court must ""review and consider the evidence."" *Id.*, quoting *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St.2d 66, 68 (1982), quoting *O'Day v. Webb*, 29 Ohio St.2d 215 (1972), paragraph three of the syllabus.

{¶ 42} The defendants' sole argument supporting their first assignment of error is based on a false premise. The defendants contend that there was a factual dispute over whether the parties modified the December 2020 agreement and, if there was a modification, the jury could have found the defendants liable for breach of the modified contract. However, Peiffer Wolf's alternative breach-of-contract claim was based solely on the December 2020 agreement — not on any purported modification thereof. Therefore, the defendants' contention that there was an issue

of fact with respect to whether the parties subsequently agreed to modify the December 2020 agreement is irrelevant.

{¶ 43} Moreover, Peiffer Wolf's claim that the defendants breached the December 2020 agreement was pled in the alternative to its claim that the defendants fraudulently induced it to enter into that agreement. The jury found in Peiffer Wolf's favor on its fraud claim and thereby invalidated the December 2020 agreement. Because Peiffer Wolf's alternative breach-of-contract claim was premised on the December 2020 agreement, there was no reason for Peiffer Wolf to pursue, or for the jury to address, that claim once the agreement was found invalid because of fraud. This point is underscored by the fact that after this court remanded the case to the trial court for lack of a final appealable order, the parties jointly filed a motion requesting the trial court amend its judgment and nunc pro tunc entries to dismiss Peiffer Wolf's alternative breach-of-contract claim. The trial court granted that motion and amended its judgments to expressly state that "the alternative claim of breach of contract is dismissed with prejudice based upon the jury's verdict."

{¶ 44} We fail to see any basis for finding that the trial court erred in granting a directed verdict on Peiffer Wolf's quantum meruit claim.

{¶ 45} Quantum meruit is

a doctrine derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implie[s] a promise to pay a reasonable amount for the services

rendered and even for materials furnished, in the absence of a specific contract.

*Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App.3d 169, 175 (8th Dist. 1992). "[I]n the absence of an express contract, an attorney can recover the reasonable value of services rendered on the basis of quantum meruit." *Shearer v. Creekview Broadview Hts. Homeowners' Assn.*, 2010-Ohio-5786, ¶ 14 (8th Dist.), citing *Baer v. Woodruff*, 111 Ohio App.3d 617 (10th Dist. 1996).

{¶ 46} At trial, Peiffer Wolf's counsel verbally moved for a directed verdict on liability only against the corporate defendants. Peiffer Wolf's counsel argued that absent a contract with the corporate defendants, the law firm was entitled under quantum meruit to a directed verdict against those defendants, with damages to be determined by the jury. Specifically, plaintiff's counsel argued the following:

> The testimony is unrebutted that there was no signed fee agreement memorializing the engagement between HLW Fast Track, HLW Fast Track PA, and Air Arch with the Peiffer Wolf law firm.
>
> . . .
>
> Construing the evidence in a light most favorable to [defense counsel's] client, there is no dispute. There was not a fee agreement. And under the law, this representation occurred and concluded and they are entitled to quantum meruit as to these three parties.

Tr. 1941-1944.

{¶ 47} Defense counsel agreed that no testimony had been introduced that established the corporate defendants entered into a fee agreement with Peiffer Wolf, but argued that Washington's own testimony created a question of fact on quantum meruit without clearly identifying that issue of fact or explaining how it impacted

the corporate defendants' liability under the quantum meruit claim. Although unclear, it appears that defense counsel may have been suggesting that there was an issue of fact as to whether the corporate defendants were parties to the December 2020 agreement based on Washington's testimony that he believed he had signed that agreement on their behalf. However, it is undisputed that the December 2020 agreement expressly identified Peiffer Wolf and Washington as the only parties to the agreement. Moreover, it is clear that Washington signed that agreement in his individual capacity — not as a representative of the corporate defendants. Washington's testimony does not create a legitimate issue of fact as to whether the corporate defendants were parties to the December 2020 agreement. The corporate defendants were not parties to that agreement.

{¶ 48} In reviewing the trial court's grant of a directed verdict, we look to determine if evidence existed on each element of the cause of action. The essential elements of recovery under quantum meruit are (1) valuable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him or her, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged. *Sonkin*.

{¶ 49} At trial, Peiffer Wolf presented undisputed evidence establishing the elements of its quantum meruit claim to recover its reasonable fees from the corporate defendants. There was no dispute that Peiffer Wolf provided legal services

on behalf of the corporate defendants, it expected to be paid for those services, Washington was aware that Peiffer Wolf expected to be paid for those services, and the corporate defendants accepted and benefited from those services. We find no error in the trial court's conclusion that, construing the evidence in favor of the nonmoving parties, reasonable minds could only conclude that Peiffer Wolf was entitled to recover from the corporate defendants the reasonable value of its attorney fees under quantum meruit.

{¶ 50} For these reasons, we overrule the defendants' first assignment of error.

## B. Manifest Weight of the Evidence

{¶ 51} In their second assignment of error, the defendants argue the jury award of $8.5 million was against the manifest weight of the evidence.

## 1. Standard of Review

{¶ 52} We will not reverse a jury's verdict as against the manifest weight of the evidence if the "'verdict is supported by some credible, competent evidence that goes to all the essential elements of the case.'" *Mohammadpour v. Haghighi*, 2023-Ohio-4211, ¶ 20 (8th Dist.), quoting *Abrams v. Siegel*, 2006-Ohio-1728, ¶ 46 (8th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). In civil and criminal cases alike, the standard of review of a manifest-weight challenge requires that an appellate court review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a

manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Alami v. Khalid*, 2024-Ohio-2456, ¶ 32-33 (8th Dist.), citing *ABV Corp. v. Cantor*, 2023-Ohio-3363, ¶ 8 (8th Dist.), citing *Eastley*, 2012-Ohio-2179 at ¶ 20.

{¶ 53} As a plaintiff's burden of proof in a civil case is a preponderance of the evidence, our review is therefore to determine whether the jury "clearly lost its way" in finding Peiffer Wolf proved by a preponderance of the evidence that the defendants owed attorney fees in the amount of $8,500,000. "'Preponderance of the evidence' means the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence." *Croone v. Arif*, 2014-Ohio-5546, ¶ 18 (8th Dist.), citing *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987). This court has found that the

> "'[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence,' in support of one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Falkenberg v. Kucharczyk*, 2022-Ohio-2361, ¶ 21 (8th Dist.), quoting *Eastley* at ¶ 12, quoting *State v. Thompkins*, 1997-Ohio-52, ¶ 24, quoting *Black's Law Dictionary* 1594 (6th Ed. 1990).

{¶ 54} In determining whether the judgment is against the manifest weight of the evidence, a reviewing court should make "every reasonable presumption in favor of the judgment and the finding of facts." *Eastley* at ¶ 20. If the evidence is

prone to more than one construction, we must give it the interpretation that is consistent with the verdict and judgment and most favorable to sustaining the trial court's verdict and judgment. *Calabrese Law Firm v. Christie*, 2024-Ohio-579, ¶ 41 (8th Dist.), citing *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77 (1984).

**2. Quantum Meruit**

{¶ 55} The jury found Washington fraudulently induced Peiffer Wolf to enter the December 2020 agreement. Without an enforceable agreement and based upon the evidence, the jury also found the elements of quantum meruit were met and, thus, Peiffer Wolf could recover its reasonable attorney fees from Washington under quantum meruit. The jury valued those attorney fees at $2,000,000. The trial court determined, when it granted Peiffer Wolf's motion for directed verdict against the corporate defendants, that Peiffer Wolf could recover its reasonable attorney fees from the corporate defendants under quantum meruit. The jury's role as to the corporate defendants was to determine the reasonable value of attorney fees owed to Peiffer Wolf for its representation of them; the jury valued those attorney fees at $6,500,000. The defendants argue the combined jury awards of $8,500,000 were against the manifest weight of the evidence.

{¶ 56} This court previously described a quantum meruit action and the related damages:

> An action in quantum meruit is in the nature of an action at law for the value of services rendered, and literally translated means "as much as he deserves." Quantum meruit rests upon the equitable principle that one shall not be permitted to unjustly enrich himself at the expense of another without making compensation therefor. Obligations imposed

under a theory of quantum meruit are imposed by law without regard to the intent or assent of the parties to be bound, and as a consequence are not truly contractual in nature.

Because obligations imposed under a theory of quantum meruit are imposed for reasons of justice and the avoidance of inequity, in order to demonstrate a prima facie case a claimant must show that he conferred a benefit upon another and that the circumstances render it unjust and inequitable to permit the other to retain the benefit without making payment therefor. Moreover, a claimant must demonstrate the reasonable value of the benefit conferred. An action in quantum meruit involves the application of equitable principles to the facts and circumstances.

*Natl. City Bank v. Fleming*, 2 Ohio App.3d 50, 57-58 (8th Dist.). Thus, in the absence of a contract, an entity may recover a reasonable amount for services rendered. *Novomont Corp. v. Lincoln Elec. Co.*, 2001 Ohio App. LEXIS 4885, *15 (8th Dist. Nov. 1, 2001), citing *Sonkin*, 83 Ohio App.3d 169 at 175 (8th Dist. 1992).

{¶ 57} One seeking to recover the value of its services in quantum meruit must prove the reasonable value of those services by competent, credible evidence. *Thomas & Boles v. Burns*, 1994 Ohio App. LEXIS 1390, *20 (8th Dist. Mar. 31, 1994), citing *Gioffre v. Simakis*, 72 Ohio App.3d 424 (10th Dist. 1991).

{¶ 58} The defendants contend that the jury award did not represent a reasonable amount for the legal services provided by Peiffer Wolf. The defendants contend that Koblentz's expert report presented the reasonable value of Peiffer Wolf's services under quantum meruit as between $3,321,627 and $4,094,910. The defendants further contend it was appropriate to use the December 2020 agreement as a guidepost — as Koblentz did in his report — in evaluating the quantum meruit award.

{¶ 59} In contrast, Peiffer Wolf argues that because the jury found fraud induced the law firm to execute the December 2020 agreement, (1) the agreement was void and no fee agreement existed between the parties and (2) absent the December 2020 agreement, no set-off for the franchises' fair market value applied to the contingency fee. Further, a reasonable 33 percent contingency fee calculated on the gross settlement could have been as high as $11,055,000 — as Koblentz testified — and, accordingly, the $8,500,000 quantum meruit award of attorney fees is reasonable.

{¶ 60} We summarize and analyze the relevant evidence submitted at trial to determine if the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

**a. Koblentz's Report**

{¶ 61} Koblentz's report, which was introduced as a trial exhibit, was premised on the understanding that there would be no contingency fee charged on the franchises' fair market value. Koblentz's report stated that under the quantum meruit theory of recovery, the attorney fees earned by Peiffer Wolf and due from Washington and the corporate defendants, collectively, ranged between $3,321,567 and $4,094,910, based upon a 33 percent contingency fee.

{¶ 62} Koblentz's report also stated that if the December 2020 agreement was unenforceable because of fraud, the matter is analogous to cases where an attorney entered a contingency fee agreement with his client, was subsequently discharged, and was permitted to recover attorney fees under quantum meruit. Per

the report, such discharged attorneys determined the reasonable value of their attorney fees rendered under a contingency fee agreement by considering the totality of the circumstances surrounding the attorney-client relationship and using the contingency agreement as a guide. Accordingly, Koblentz used the December 2020 agreement as a guide for establishing the fees owing to Peiffer Wolf:

> Therefore, applying a range of factually and historically utilized multiples to the 12 months pre-debt cash flow of Mr. Washington's stores in September, 2021 and the 33% contingent fee of the Fee Agreement as a guide, the amount of attorney fees earned by Peiffer Wolf and due from Mr. Washington under a quantum meruit theory of recovery range in amount of between $4,094,910 to $3,321,567.

Koblentz's report, p. 22. We note Koblentz's report referenced the corporate defendants and Washington, collectively, as "Mr. Washington" and, at times, the corporate defendants individually as "Washington's Entities."

{¶ 63} Koblentz's report further opined that the reasonable attorney fees due to Peiffer Wolf from the defendants, collectively, ranged from $3,230,700 under a breach-of-contract theory and from $3,321,567 to $4,094,910 under quantum meruit:

> In light of all the above, and upon review of the materials and information listed above, together with my knowledge of applicable legal authority and my own professional experience, reputation, and skill, it is my professional opinion and that of this law firm, to a degree of reasonable professional legal certainty, that the amount of reasonable attorney fees earned by Peiffer Wolf in its representation of Mr. Washington and the Washington Entities in the Underlying Matter range in amount from $4,094,910 to $3,230,700, whether that amount of attorney fees is owed to Peiffer Wolf pursuant to the terms of the Fee Agreement or, alternatively, as determined under the theory of equitable relief of quantum meruit.

Koblentz report, p. 26.

**{¶ 64}** Koblentz's report also stated the value of Washington's franchises "was directly at issue as a matter of damages in Mr. Washington's discrimination claims . . . ." Koblentz report, p. 21.

**b. Trial Testimony of Washington and Conway**

**1. Washington**

**{¶ 65}** Washington testified that he agreed to a contingency fee that excluded the fair market value of the franchises. Washington stated it was "imperative" to exclude the franchises' fair market value from the contingency fee in order "to protect the sale of [his] restaurants" and to ensure payment for the franchises exclusively benefitted Washington. Tr. 1870. Washington stated he made it clear to Peiffer Wolf that he would not pay a contingency fee on any amount below the fair market value. Additionally, the December 2020 agreement executed by Washington excluded the fair market value of the franchises from the contingency fee calculation. Washington's testimony demonstrated his understanding that the contingency fee would be limited to the portion of the recovery that related to the alleged discrimination claims.

**2. Conway**

**{¶ 66}** Conway, the managing partner of Peiffer Wolf, informed the jury that his firm earned a contingency fee on the value it added to a case:

> So we are contingency fee lawyers, so I think some of you had familiarity with that, but basically what that means is we only earn fees if we add value and achieve, you know, some sort of resolution or

success for our clients. So, you know, again, that value system thing I am talking about, this is who I am. It brings access to fight corporate giants and creates immediate alignment with me and my clients. So that — I mean, earning our income is contingent on winning for our clients.

Tr. 519. The value added in the discrimination case would have been any settlement above the fair market value of the franchises.

{¶ 67} Conway's testimony showed Peiffer Wolf and Washington's intentions — from the early stages of their negotiations on the contingency fee agreement — were to calculate the contingency fee on any recovery excluding the franchises' fair market value. Conway testified about an email he sent to Washington following an October 29, 2020 phone call that reiterated the firm's intention to exclude the fair market value from the contingency fee: "So I typically shoot an email after a call. And this [email] is now starting to flush out carving fair market value out of how we will calculate our contingency fee." Tr. 526-527. When discussing Peiffer Wolf's proposed second draft of the contingency fee agreement, Conway again emphasized exclusion of the franchises' fair market value from the fee:

PLAINTIFF'S COUNSEL: And if we could look at 4.1 and 4.2, let's talk about what was different in this agreement?

CONWAY: Sure. I think the main thing really to focus on is the sentence ["]value received shall not include any payment or value received by client for the sale of any McDonald's store.["]

PLAINTIFF'S COUNSEL: So this was your first effort to try and embrace what had previously been discussed?

CONWAY: Yeah. This is trying to like get the conversation going to carve out fair market value of his stores, yes.

Tr. 527. Likewise, a November 17, 2020 email from Conway to Washington discussed the exclusion of the franchises' fair market value: "We are all on the same page, and we are definitely not interested in trying to make money off of the potential/likely transfer of your McDonald's locations throughout and at the end of this lawsuit." Plaintiff's exhibit No. 18.

{¶ 68} Conway also testified extensively about his efforts to ascertain the proper formula to calculate the fair market value of the franchises. The fair market value was an essential term since the parties intended to exclude that amount from the contingency fee. Conway stated the December 2020 agreement reflected the parties' intent to determine the contingency fee excluding the franchises' fair market values.

{¶ 69} Further, Conway conceded at trial that he believed the fair market value of the franchises should not be subject to the contingency fee:

PLAINTIFF'S COUNSEL: Tell me about this conversation.

CONWAY: This part of the conversation is where we are starting — so I want to make it clear, like earning a contingency is based off of the value you create. And so getting into figuring out how to carve something out of that just so there's not confusion, it's just for adding clarity because we make money on the value we create. And when [Washington] said I have, you know, X stores worth X dollars, you should [not] make money off of that. I agree. I agreed then, I agree now.

PLAINTIFF'S COUNSEL: Do you recall what's in the middle of this first page, what Mr. Washington discussed with you about the fee structure?

CONWAY: Yes. Basically it covers what I just said. You know, if my stores are worth $10, I can get that today, tomorrow, later. You should

earn 33 percent above the $10. I said totally agree. Looking to not include fair market value.

Tr. 520-521.

{¶ 70} Both Washington and Conway testified that the contingency fee would be calculated only on any recovery that exceeded the fair market value of the franchises.

## c. Koblentz's Trial Testimony

{¶ 71} During his trial testimony, Koblentz's reference to a possible contingency fee based on the settlement figure that included the fair market value of the franchises disregarded the parties' expressed intentions as well as the assumptions he used in his own written expert report. Koblentz testified that "under normal quantum meruit in light of the decision that Mr. Washington made to disavow putting his corporate entities on the contract," the 33 percent contingency fees owing to Peiffer Wolf totaled $11,055,000. Tr. 1321. Koblentz further testified in response to essentially a hypothetical question that application of quantum meruit could result in an attorney fee payment of $11,055,000:

> PLAINTIFF'S COUNSEL: The money was paid to HLW Fast Track, correct?
>
> KOBLENTZ: That is correct.
>
> PLAINTIFF'S COUNSEL: Who, based upon Mr. Washington's disavowing of the agreement in September, wasn't a party to a fee agreement?
>
> KOBLENTZ: That is correct also.

PLAINTIFF'S COUNSEL: And under Ohio law that means that HLW Fast Track owes the Peiffer Wolf firm under quantum meruit?

KOBLENTZ: Under quantum meruit calculation, that would be correct, sir.

PLAINTIFF'S COUNSEL: And under Ohio law, the quantum meruit is 33 percent, which is the fee agreement — the fee contingency percentage they were willing to charge, of the gross recovery, correct?

KOBLENTZ: That would be the standard quantum meruit calculation that would be utilized in the legal industry relative to matters like this.

PLAINTIFF'S COUNSEL: And so if Mr. Washington is to have his way, then his corporate entities owe $11,055,000?

KOBLENTZ: That would also be correct.

Tr. 1394-1395.

{¶ 72} Koblentz also testified that his expert report stated, under the theory of quantum meruit, that the defendants owed Peiffer Wolf attorney fees ranging from $3,250,491 to $3,767,372.

**d. Analysis**

{¶ 73} Washington and Peiffer Wolf understood that the contingency fee would be limited to the portion of the recovery that related to McDonald's alleged discrimination and the parties never agreed otherwise. Washington and Conway testified that the parties agreed Peiffer Wolf should not recover attorney fees on any settlement related to the fair market value of the franchises since that portion of the settlement was unrelated to Peiffer Wolf's management of the discrimination lawsuit. And the basis for this reasoning was fairness — Washington could negotiate the sale of his franchises without Peiffer Wolf's assistance and, therefore, Peiffer

Wolf should not earn a contingency fee on that portion of the settlement. Similarly, Koblentz's expert report estimated the reasonable range of attorney fees to be recovered under quantum meruit as between $3,321,567 and $4,094,910, dollar amounts that excluded the fair market value of the franchises.

{¶ 74} Koblentz's broad statements at trial that "under normal quantum meruit analysis" or under the "standard quantum meruit calculation in the legal industry," a reasonable value of the attorney fees for the corporate defendants would be $11,055,000 were not consistent with his report or how the parties valued the legal services. The hypothetical question that elicited Koblentz's testimony about attorney fees in the amount of $11,055,000 was not tethered to the evidence in the case. In contrast, Koblentz's expert report was based on the premise that the fair market value of the franchises would be excluded from the contingent fee calculation, and the testimony of Washington and Conway supported this position. Additionally, the December 2020 agreement was not representative of a "normal" or "standard" agreement. Unlike a standard fee agreement, the parties intended to exclude the fair market value of the franchises from the contingency agreement, and the parties agreed to a 33 percent contingency fee rather than the standard 40 percent fee.

{¶ 75} The evidence is undisputed that Peiffer Wolf never intended to charge a contingency fee on the fair market value of the franchises. Therefore, Peiffer Wolf's contention that the jury award is supported by Koblentz's trial testimony is overwhelmed by the weight of the other evidence — principally Koblentz's written

report that reflects the parties' shared understanding that was confirmed through Washington and Conway's trial testimony — that Peiffer Wolf would not include the fair market value of the franchises in calculating its contingency fee, even though they disagreed on how the fair market value should be determined. Without the portion of Koblentz's trial testimony that references attorney fees in the amount of $11,055,000, there is simply no other evidence to support the magnitude of the jury's quantum meruit determination.[4]

{¶ 76} Our review of the evidence submitted at trial demonstrates the jury clearly lost its way when it entered a judgment against the corporate defendants in the amount of $6,500,000 and against Washington in the amount of $2,000,000, and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered to determine the reasonable value of Peiffer Wolf's legal services rendered to the defendants. For the foregoing reasons, we find that the jury's award of attorney fees, pursuant to quantum meruit, was against the manifest weight of the evidence and, the second assignment of error is sustained.

---

[4] Peiffer Wolf contends that if the jury found the franchises had no value — because the stores violated their franchise agreements with McDonald's — then the full $33,500,000 settlement was paid in satisfaction of the discrimination claim. Peiffer Wolf further contends that a 33 percent contingency fee on $33,500,000 totals $11,055,000, and therefore, the jury's verdict of $8,500,000 was a reasonable award permissible under quantum meruit. However, Peiffer Wolf sought to stay discovery and schedule the second mediation so that McDonald's would not learn about the alleged material breaches. Absent such information, McDonald's had no basis to believe the franchises were worthless and offer a settlement only on the discrimination claim. Further, the parties and mediator understood any mediation offer over $21,700,000 was in payment of the discrimination claim — demonstrating McDonald's assumed fair market value of the franchises at $21,700,000. Thus, we find this argument without merit.

We reverse the jury's award of compensatory damages and remand for a new trial solely on this issue.

{¶ 77} Judgment affirmed in part, reversed in part, and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellants and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
WILLIAM A. KLATT, JUDGE*

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)